IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

**UNITED STATES OF AMERICA**,
    Plaintiff,

v.

**DIWEL JOSE PIERRET-MERCEDES**,
    Defendant.

Civil No. 22-cr-430 (ADC/BJM)

## REPORT AND RECOMMENDATION

On September 29, 2022, a grand jury indicted Diwel Jose Pierret-Mercedes ("Pierret-Mercedes") on one count of improper entry by an alien in violation of 8 U.S.C. § 1325(a)(2) and one count of knowingly possessing a firearm and ammunition as an illegal alien in violation of 18 U.S.C. § 922 (g)(5). Docket No. ("Dkt.") 12. Pierret-Mercedes moved to dismiss Count Two of the indictment, arguing 18 U.S.C. § 922 (g)(5) is a facially unconstitutional violation of the Second Amendment after the Supreme Court's decision in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022) and that it is unconstitutional as applied to him. Dkt. 19. The government opposed, Dkt. 21, and Pierret-Mercedes responded. Dkt. 23. The parties' motions were referred to me for a report and recommendation. Dkt. 21. For the reasons that follow, I recommend that Pierret-Mercedes's motion to dismiss Count Two of the indictment be **DENIED.**

## BACKGROUND

The following factual allegations are taken from the indictment and from motions made by the parties. For the purpose of determining the present motions, the following facts appear to be undisputed.

Pierret-Mercedes is a 27-year-old from the Dominican Republic. He first entered Puerto Rico without authorization around November 2015. After working as a barber for about a year, he attempted to travel to New York. While at the airport, he encountered Customs and Border

Protection ("CBP") officers who returned him to the Dominican Republic via CBP's Expedited Removal process.

Near the end of 2021, Pierret-Mercedes returned to Puerto Rico. He lived with his aunt in Villa Palmeras and later stayed with his Puerto Rican girlfriend in the Las Margaritas housing development. During the approximately 9 months from his return to Puerto Rico until his arrest, Pierret-Mercedes again worked as a barber.

Puerto Rico Police Bureau ("PRPB") investigators allegedly received information that an individual later identified as Pierret-Mercedes lived in apartment 376 of building 14 at Las Margaritas. This individual was purportedly storing drugs and guns in that apartment for an organized crime group. PRPB investigators surveilled the area and allegedly witnessed the individual later identified as Pierret-Mercedes repeatedly entering and exiting apartment 376. Further, they repeatedly saw him with what appeared to be pills and marijuana. And they saw him twice with a pistol magazine, once in his waistband and later in his pants pocket.

Based on their observations, PRPB investigators sought and obtained a search warrant for apartment 376, which they executed on the morning of September 13, 2022. Upon entering the apartment, PRPB agents found Pierret-Mercedes and a woman in a bedroom. On the bed beside Pierret-Mercedes, there was a loaded rifle.

Following this encounter, Homeland Security Investigations ("HSI") agents interviewed Pierret-Mercedes. They gave him a Declaration-of-Rights form written in Spanish and he waived his rights by signing the form. Dkt. 21-2. Pierret-Mercedes stated he had lived with his girlfriend in the apartment where he was arrested for approximately one month. He also said he had been in Puerto Rico for the previous nine months and had arrived via a vessel. Further, he admitted the

firearm on the bed belonged to him and that he bought it within the past few weeks for protection. HSI agents ultimately determined he was unlawfully present in the United States.

On September 29, 2022, a grand jury indicted Pierret-Mercedes. He moves to dismiss Count Two of the indictment which charges him with knowingly possessing a firearm and ammunition as an illegal alien in violation of 18 U.S.C. § 922 (g)(5).

## APPLICABLE LEGAL STANDARDS

Beyond technical defects and cases of misconduct, a federal court can exercise its supervisory power and supplant the grand jury's "fundamental role" by dismissing an indictment only in "extremely limited circumstances." *Whitehouse v. U.S. Dist. Ct. for Dist. of R.I.*, 53 F.3d 1349, 1360 (1st Cir. 1995) (citing *Bank of Nova Scotia v. United States*, 487 U.S. 250, 263 (1988)). Defendants may not challenge the government's evidence, only the facial validity of the indictment. *United States v. Guerrier*, 669 F.3d 1, 3–4 (1st Cir. 2011) (citing *United States v. Eirby*, 262 F.3d 31, 37–38 (1st Cir. 2001)). However, the First Circuit has held that a district court may consider pretrial motions to dismiss an indictment "where the government does not dispute the ability of the court to reach the motion and proffers, stipulates, or otherwise does not dispute the pertinent facts." *United States v. Musso*, 914 F.3d 26, 30 (1st Cir. 2019).

## DISCUSSION

Pierret-Mercedes contends Section 922(g)(5) is both facially unconstitutional and unconstitutional as applied to him. Dkt. 19. Further, he argues it violates the Equal Protection Clause of the Fourteenth Amendment. Dkt. 23 at 7–9. I address each argument in turn and find that none warrants dismissal of the indictment against him.

  **I.  The Second Amendment**

**A. Facially Unconstitutional**

  The Second Amendment provides, "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In *D.C. v. Heller*, the Supreme Court held that the Second Amendment protects "the right of an ordinary, law-abiding citizen to possess a handgun in the home for self-defense." 554 U.S. 570 (2008). And just last term, in *Bruen*, the Court held "consistent with *Heller* and *McDonald* [*v. Chicago*, 130 S.Ct. 3020 (2010)], that the Second and Fourteenth Amendments protect an individual's right to carry a handgun for self-defense outside the home." *Bruen*, 142 S. Ct. at 2122.

  Before *Bruen*, courts of appeals had "coalesced around a 'two-step' framework" when assessing Second Amendment claims, combining a historical analysis with means-end scrutiny. *Id.* at 2125. For the first step, the court would establish the Second Amendment's original scope through a historical analysis. *United States v. Focia*, 869 F.3d 1269, 1285. (11th Cir. 2017). If the regulated conduct fell outside the Amendment's original scope, "the analysis can stop there; the regulated activity is categorically unprotected." *United States v. Greeno*, 679 F.3d 510, 518 (6th Cir. 2012). But if not outside the Amendment's scope or "inconclusive," the court would proceed to step two. *Kanter v. Barr*, 919 F.3d 437, 441 (7th Cir 2019).

  In step two, a court would generally analyze "how close the law comes to the core of the Second Amendment right and the severity of the law's burden on that right." *Id.* If the "core" Second Amendment right—self-defense in one's home—was burdened, the court would apply strict scrutiny. *Kolbe v. Hogan*, 849 F.3d 114, 133 (4th Cir. 2017). Otherwise, it would apply intermediate scrutiny, considering whether the government had shown that the regulation is

"substantially related to the achievement of an important governmental interest." *Kachalsky v. Cnty. of Westchester*, 701 F.3d 81, 86. (2nd Cir. 2012).

But in *Bruen*, Justice Thomas stated the two-step approach was "one step too many." 142 S. Ct. at 2127. In its place, Justice Thomas articulated a new standard that courts must follow:

> When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

*Id.* at 2129–30. Under this inquiry, the threshold question is whether the Second Amendment's plain text covers Pierret-Mercedes's conduct.

### i. *Pierret-Mercedes's Conduct*

"[T]he 'textual elements' of the Second Amendment's operative clause—'the right of the people to keep and bear Arms, shall not be infringed'—'guarantee the individual right to possess and carry weapons in case of confrontation.'" *Bruen*, 142 S. Ct. at 2134 (quoting *Heller*, 554 U.S. at 592). Pierret-Mercedes was arrested at home with a pistol in his possession. Prior to his arrest, HSI agents saw him emerge from his home with a pistol magazine. He is charged under 18 U.S.C. § 922(g)(5) which makes it "unlawful for any person . . . who, being an alien is illegally or unlawfully in the United States . . . to . . . possess any firearm or ammunition . . . which has been shipped or transported in interstate or foreign commerce." 18 U.S.C. § 922(g)(5).

The Second Amendment undoubtedly protects Pierret-Mercedes's conduct. "Answering whether possession falls under 'keep and bear' isn't complicated. According to Justice Scalia in *Heller*, to 'keep arms' means to 'have weapons.' The plain meaning of 'have' is 'to be in possession of.' Thus, the Second Amendment's 'keep and bear arms' language plainly encompasses possession." *United States of America v. Jeroswaski Wayne Collette*, 2022 WL

4476790, at *2 (W.D. Tex. Sept. 25, 2022) (quoting Have, OXFORD ENGLISH DICTIONARY (3d ed. 2015)). Further, the "definition of 'bear' naturally encompasses public carry." *Bruen*, 142 S. Ct. at 2134. Because the Second Amendment's plain text covers possession of a firearm both in public and private, the constitutionality of Section 922 (g)(5) depends on whether prohibiting undocumented immigrants from possessing a firearm is consistent with the nation's historical tradition of firearm regulation.

The government argues I should not reach that question because caselaw and historical context show the Second Amendment does not protect undocumented immigrants. Citing to its use of "the people," Pierret-Mercedes argues that it does. Dkt. 19 at 6–7. The government claims it only applies to "law-abiding citizens." Dkt. 21 at 4–11. Though the First Circuit has not resolved this question, eight circuit courts have considered the issue. The Fourth, Fifth, and Eighth Circuits have found that Second Amendment protections do not extend to undocumented immigrants. *See United States v. Carpio-Leon*, 701 F.3d 974 (4th Cir. 2012); *United States v. Portillo-Munoz*, 643 F.3d 437 (5th Cir. 2011); *United States v. Flores*, 663 F.3d 1022 (8th Cir. 2011). Although the Second, Ninth, Tenth, and Eleventh Circuits found the Second Amendment may protect undocumented immigrants, they declined to conclusively rule on the issue while upholding Section 922(g)(5). *See United States v. Perez*, 6 F.4th 448, 453 (2d Cir. 2021) (assuming, without deciding, that undocumented immigrants have a constitutional right to possess firearms but finding § 955(g)(5) to be a permissible restriction when applied to the facts of the case); *United States v. Torres*, 911 F3d 1253, 1257, 1261 (9th Cir. 2019) (assuming, without deciding, that the Second Amendment extends to unlawful aliens but concluding the statute is constitutional under intermediate scrutiny); *United States v. Huitron-Guizar*, 678 F.3d 1164, 1169 (10th Cir. 2012) ("We think we can avoid the constitutional question by assuming, for purposes of

this case, that the Second Amendment, as a 'right of the people,' could very well include, in the absence of a statute restricting such a right, at least some aliens unlawfully here–and still easily find § 922(g)(5) constitutional."); *United States v. Jimenez-Shilon*, 34 F.4th 1042, 1045–46 (11th Cir. 2022) (declining to "definitively decide whether Jimenez [an illegal alien] is among 'the people'" because, even assuming he is, as an illegal alien he "may be forbidden from bearing arms while living within our borders" without offending the Second Amendment). Only the Seventh Circuit has definitively found that the Second Amendment grants undocumented individuals the right to bear arms. *United States v. Meza-Rodriguez*, 798 F.3d 664 (7th Cir. 2015) (finding an undocumented immigrant is protected by the Second Amendment but that § 955(g)(5) nonetheless constitutes a permissible restriction).

Pierret-Mercedes argues *Bruen* changes this analysis and that reliance on previous courts' "collective-right" analysis is misplaced. Specifically, he says *Heller* and *Bruen* foreclose arguments that the right to bear arms is connected to one's membership in a political community. Dkt. 23 at 7. Additionally, he contends he is included in the meaning of "the people" as it is used in the Constitution. Dkt. 23 at 3. However, one post-*Bruen* court has already considered and rejected both arguments. *United States v. DaSilva*, 2022 WL 17242870 (M.D. Pa. Nov. 23, 2022). After a lengthy retelling of the *Jimenez-Shilon* decision, the *DaSilva* court found 18 U.S.C. § 922(g)(5) did not violate the Second Amendment because:

> [T]he rights of those who lack an undivided allegiance to the United States, and thus do not owe or have sworn such an allegiance and *are outside of the membership of the political community*, as well as those individuals who are considered "unvirtuous", have been circumscribed since the Founding Era of this country. Illegal aliens, by definition only, may be considered to lack undivided allegiance to this Nation as well as to be unvirtuous (in so far as they have entered the United States in violation of the Nation's laws).

*Id.* at *10 (emphasis added). Further, it noted that some groups included among "the people" are nevertheless not protected by the Second Amendment. *Id.* at *7 (citing *Jimenez-Shilon*, 34 F.4th

at 1045–46 (finding the Second Amendment codified a "pre-existing right" and "even individuals who are indisputably part of 'the people,' such as dangerous felons and those suffering from mental illness, might not partake of that pre-existing right and, therefore, may be prohibited from possessing firearms without offending the Second Amendment.")). A New Mexico court that considered this issue post-*Bruen* found whether the Second Amendment covered undocumented immigrants was ambiguous because *Bruen* did not address undocumented immigrants and the Tenth Circuit has held that undocumented immigrants are protected by the Fifth, Sixth, and Fourteenth Amendments. *United States v. Leveille*, 2023 WL 2386266, at *2 (D.N.M. Mar. 7, 2023) (citing *Huitron-Guizar*, 678 F.3d at 1167). It thus assumed without deciding that the Second Amendment includes "at least some aliens unlawfully here" and proceeded to step two of the *Bruen* inquiry. *Id.* at 3 (citing *Huitron-Guizar*, 678 F.3d at 1169).

The First Circuit has likewise held that undocumented immigrants are protected by the Fifth Amendment. *Vieira García v. INS*, 239 F.3d 409, 414 (1st Cir. 2001). The government apparently believes Pierret-Mercedes is entitled to counsel and advised him accordingly. Dkt. 21-2. And the Supreme Court has held undocumented immigrants may claim the benefit of Equal Protection under the Fourteenth Amendment. *Plyler v. Doe*, 457 U.S. 202, 215 (1982). Thus, I follow the *DaSilva* and *Leveille* courts and assume without deciding that the Second Amendment's use of "the people" includes at least some undocumented immigrants. Accordingly, I turn to the second step of the *Bruen* inquiry.

    *ii.*     **The Nation's Historical Tradition of Firearm Regulation**

Here, courts must "assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding." *Bruen*, 142 S. Ct. at 2131 (2022). "[W]hen a challenged regulation addresses a general societal problem that has persisted since the

Case 3:22-cr-00430-ADC   Document 32   Filed 04/14/23   Page 9 of 15

*United States of America v. Diwel Jose Pierret-Mercedes,* Criminal No. 22-430 (ADC/BJM)                                    9

18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Id.* Similarly, "if earlier generations addressed the societal problem, but did so through materially different means, that also could be evidence that a modern regulation is unconstitutional." *Id.* Further, "if some jurisdictions actually attempted to enact analogous regulations during this timeframe, but those proposals were rejected on constitutional grounds, that rejection surely would provide some probative evidence of unconstitutionality." *Id.* "Courts are . . . entitled to decide a case based on the historical record compiled by the parties." *Bruen,* 142 S. Ct. at 2130 n. 6.

However, if the problem was "unimaginable at the founding" courts must reason by analogy. *Id.* at 2133. This inquiry examines "how and why the regulations burden a law-abiding citizen's right to armed self-defense" and "whether that burden is comparably justified." *Id.* Under this inquiry, the government need only identify "a well-established and representative historical analogue, not a historical twin." *Id.* As an example, the Supreme Court noted that 18th- and 19th-century regulations prohibiting weapons in relatively few sensitive places (legislative assemblies, polling places, and courthouses) could be expanded to new and analogous sensitive places. *Id.*

First, the parties disagree over which standard applies. Pierret-Mercedes contends immigrants have lived in the United States since before its independence and the government must identify "distinctly similar" historical regulations. Dkt. 19 at 7–10. He argues that when the British Crown "began to disarm the inhabitants of the most rebellious areas" Americans reacted by invoking "their rights as Englishmen to keep arms." *Id.* at 8 (citing *Heller*, 554 U.S. at 594). He mentions *Heller*'s citation of a 1769 article proclaiming the right to keep arms for one's own defense was a natural right. *Id.* (citing *Heller*, 554 U.S. at 594). He then notes that African, Scottish, German, Dutch, French, and other individuals lived in the United States at the time of the

founding. *Id.* at 9. Nevertheless, he argues more than ten state constitutions codified the right to bear arms following independence. *Id.* The government does not address these arguments, but contends that Section 922(g)(5) is analogous to founding-era laws that forbade arming Native Americans, Catholics, and people who refused to swear oaths of allegiance. Dkt. 21 at 12–13. Though the government acknowledges laws barring gun ownership by Native Americans and Catholics would be unconstitutional today, it says they show the right to bear arms was limited to those within the political community. *Id.* at 15.

The government has the better argument. The *Leveille* court "reject[ed] the notion that Section 922(g)(5) is directly historically derivative of any colonial-era laws," but found it could be analogized to other colonial era regulations. 2023 WL 2386266, at *4–5. It reasoned that immigration restrictions as they are now understood did not come into being until the late nineteenth century. *Id.* (citing "Early American Immigration Policies," United States Citizenship and Immigration Services, 30 July 2020, https://www.uscis.gov/about-us/our-history/overview-of-ins-history/early-american-immigration-policies). The *DaSilva* court did not explicitly decide the applicable standard, but upheld Section 922(g)(5) by analogizing it to colonial era gun laws. 2022 WL 17242870, at *10. No court has required the government to identify a "distinctly similar" historical regulation to uphold the constitutionality of Section 922(g)(5). Accordingly, I proceed to examine analogous historical regulations.

At this stage of the inquiry, the *Leveille* court decided Section 922(g)(5) could be analogized to historical restrictions on individuals who would not swear an oath of allegiance to the United States or were otherwise considered outsiders. 2023 WL 2386266, at *4–5. It observed that "today's immigration system functions as an attempt to define the nation's members and nonmembers." *Id.* at *4. Though it acknowledged this system is "flawed" and "imperfect" for a

variety of reasons, it nevertheless found it to be the system the United States has established as a proxy for national allegiance. *Id.* Though colonial era laws stripped guns from those who refused to swear an oath, while many undocumented immigrants would like to do so but lack the opportunity, the *Leveille* court nevertheless found the situation analogous. *Id.* Turning to the "how" and "why" of the analogy analysis, it found colonial era regulations, like Section 922(g)(5), amounted to a total prohibition of firearm access because "in the view of the legislature, providing firearms to those who have not demonstrated allegiance to this nation might put weapons in the hands of those who would do the nation harm." *Id.* Though the colonial era laws did not perfectly mirror Section 922(g)(5), the *Leveille* court nevertheless found them "relevantly similar." *Id.* (citing *Bruen*, 142 S. Ct. at 2132–33).

The *DaSilva* court similarly analogized to colonial laws barring firearm possession by those who lacked an undivided allegiance to the United States or were considered "unvirtuous." 2022 WL 17242870, at *10. It cited *Jimenez-Shilon*, which noted English law predating the founding drew a "sharp distinction" between natural-born or naturalized subjects and "aliens." *Id.* at *9 (citing *Jimenez-Shilon*, 34 F.4th at 1046-1047) (further citations omitted). While the former had a variety of rights, including arms for the defense, the latter's rights were "much more circumscribed." *Id.* Likewise, colonial governments did not extend the right to bear arms to all New World residents. *Id.* (citing *Jimenez-Shilon*, 34 F.4th at 1047). Next, when war broke out, people who didn't support the revolution were ordered to turn over their guns. *Id.* (citing *Jimenez-Shilon*, 34 F.4th at 1047). After independence, many state constitutions limited gun ownership to citizens. *Jimenez-Shilon*, 34 F.4th at 1049 (citing state constitutions of Pennsylvania, Kentucky, Mississippi, Connecticut, Alabama, and Maine). The *DaSilva* court noted the Second and Fourth Circuits conducted similar surveys of early American gun regulations and likewise concluded that

subversives, noncitizens, and those deemed dangerous or disloyal were barred from gun ownership. 2022 WL 17242870, at *9–10 (citing *Perez*, 6 F.4th at 462–63; *Carpio-Leon*, 701 F.3d at 980).

Pierret-Mercedes responds that these laws do not suffice to show a well-established and longstanding history of disarming outsiders. Dkt. 21 at 6–9. As discussed, the *Bruen* court apparently believed eighteenth-century regulations on guns in sensitive places were sufficiently longstanding. *See* 142 S. Ct. at 2133. Accordingly, eighteenth-century restrictions on gun-ownership by political outsiders would likewise meet that threshold. Because Section 922(g)(5) is relevantly similar to well-established and representative historical analogues, it is not facially unconstitutional under the Second Amendment.

### B. Unconstitutional As Applied

Assuming Section 922(g)(5) is facially constitutional, Pierret-Mercedes argues it is unconstitutional as applied to him because he has developed sufficient connections with the United States to be considered part of the national community and because Second Amendment protections are "at their zenith within the home." Dkt. 19 at 10–12. The analysis above forecloses both arguments. Regardless of his employment and familial ties, Pierret-Mercedes can only develop the connection to the United States necessary for Second Amendment protection by swearing an oath of allegiance to this country. *Leveille*, 2023 WL 2386266, at *4. "Certainly, any number of examples prove that this metric is flawed." *Id.* (comparing noncitizens brought without documentation as infants who cannot obtain citizenship to American citizens who wish the country "as much harm as any foreign terrorist might"). Nevertheless, that is the calculation Congress has made and this court is not tasked with "weigh[ing] the merits and faults of Section 922(g)(5) from a policy perspective." *Id.* And though Second Amendment protections may be "at their zenith

within the home," those protections do not apply to Pierret-Mercedes for the reasons already discussed. *See id.* (crediting undocumented immigrants' fear of hate crimes as "a valid contention" but deferring to Congress's judgment barring them from possessing weapons for public safety reasons). Accordingly, Section 922(g)(5) is not unconstitutional as applied to him.

## II. Equal Protection

Noting the government's citation of colonial laws barring Native Americans and Catholics from possessing weapons, Pierret-Mercedes argues Section 922(g)(5) must comply with the Equal Protection Clause of the Fourteenth Amendment and the Civil Rights Act of 1964, 42 U.S.C. § 2000a, *et. seq.* Dkt. 23 at 7–9. The government concedes that banning gun ownership by Native Americans and Catholics would violate the Constitution. Dkt. 21 at 15. However, it offers those laws as examples of the nation's historical exclusion of outsiders from gun ownership to support its claim that it may engage in constitutionally permissible exclusion today. *Id.* As for the Civil Rights Act of 1964, that landmark legislation bans discrimination in public accommodations, federally assisted programs, and employment. *See* 42 U.S.C. § 2000a, *et. seq.* Pierret-Mercedes does not explain how those protections apply here and it is unclear how they would. "[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990). Nevertheless, his Equal Protection argument warrants further examination.

Though Pierret-Mercedes argues the government may not use Section 922(g)(5) to circumvent prohibitions against discrimination based on race, religion, ethnicity, or national origin, the statute does not authorize discrimination on these grounds. Section 922(g)(5) prohibits firearm possession by undocumented immigrants, not Dominicans. Still, "[a]lienage, like race and nationality, constitutes a suspect classification under the Fourteenth Amendment." *Bruns v.*

*Mayhew*, 750 F.3d 61, 66 (1st Cir. 2014) (citation omitted). Thus, "a state's alienage-based classifications inherently raise concerns of invidious discrimination and are therefore generally subject to strict judicial scrutiny." *Id.* However, "[t]he calculus is markedly different for *congressional* acts distinguishing on the basis of alienage, evaluated under the Due Process Clause of the Fifth Amendment." *Id.* (emphasis in original) (citations omitted). "Because Congress acts with plenary authority when it legislates the rights and benefits to be afforded aliens present in this country, such congressional acts are appropriately afforded rational basis judicial review." *Id.*

Here, the government argues undocumented immigrants have an interest in evading authorities, are more difficult to track, and have already shown a willingness to defy the law making them candidates for further malfeasance. Dkt. 21 at 14. When upholding Section 922(g)(5), the Second Circuit wrote, "[b]y not taking part in all formal systems of registration, identification, or employment that the law requires, undocumented aliens are 'harder to trace' and thus their behavior is harder to regulate in some respects." *Perez*, 6 F.4th at 455 (citing *Torres*, 911 F.3d at 1264); *see also Leveille*, 2023 WL 2386266, at *4 (deferring to Congress's judgment about the public safety concerns of firearm possession by undocumented immigrants). Given the rational basis for Section 922(g)(5), it does not violate the Equal Protection Clause of the Fourteenth Amendment.

## CONCLUSION

For the foregoing reasons, I recommend that Pierret-Mercedes's motion to dismiss the indictment be **DENIED**.

This report and recommendation is filed pursuant to 28 U.S.C. 636(b)(1)(B) and Rule 72(d) of the Local Rules of this Court. Any objections to the same must be specific and must be filed with the Clerk of Court within fourteen days of its receipt. Failure to file timely and specific

objections to the report and recommendation is a waiver of the right to appellate review. *See Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Davet v. Maccorone*, 973 F.2d 22, 30–31 (1st Cir. 1992); *Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir. 1988); *Borden v. Sec'y of Health & Human Servs.*, 836 F.2d 4, 6 (1st Cir. 1987).

**IT IS SO RECOMMENDED.**

In San Juan, Puerto Rico, this 14th day of April 2023.

S/ *Bruce J. McGiverin*
BRUCE J. MCGIVERIN
United States Magistrate Judge