## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

**UNITED STATES OF AMERICA**

**v.**

**DIWEL JOSE PIERRET-MERCEDES,**

**Defendant.**

**Crim No. 22-430 (ADC)**

## OPINION AND ORDER

### I.    Introduction

Section 922(g)(5)(A) of title 18, U.S. Code, makes it unlawful for a noncitizen "illegally or unlawfully in the United States[,]… to… possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce." 18 U.S.C. § 922(g)(5)(A).[1] The Court is called today to decide whether Congress infringed on the right to keep and bear arms protected by the Second Amendment by enacting Section 922(g)(5).[2] According to *New York State Rifle & Pistol Ass'n, Inc.*

---

[1] Whenever possible, this Opinion & Order uses the term "noncitizen" as equivalent to the statutory term "alien." *See, e.g., Santos-Zacaria v. Garland,* 598 U.S. 411, 414 n. 1 (2023); *Nasrallah v. Barr,* 590 U.S. 573, 578 n. 2 (2020). Accordingly, the term "noncitizen" should be taken to mean "any person not a citizen or national of the United States." 8 U.S.C. §1101(a)(3); *see* 18 U.S.C. § 922(y)(1)(A) (applying definition to 18 U.S.C. § 922(g)(5)). However, because of the historical nature of the analysis contained in this Opinion & Order, the Court will not always be able to uniformly adhere to this terminology.

[2] Although the parties refer in their filings to Section 922(g)(5), the specific statutory provision at issue here is Section 922(g)(5)(A). Therefore, even if not specifically mentioned, the Court's Opinion & Order should be read to refer only to Section 922(g)(5)(A).

*v. Bruen*, 597 U.S. 1, 142 S. Ct. 2111 (2022), the answer to this question lies somewhere in the United States' historical tradition of firearms regulation.

Concretely, what is before the Court is Magistrate Judge Bruce J. McGiverin's Report & Recommendation ("R&R") issued on April 14, 2023, recommending the denial of defendant Diwel José Pierret-Mercedes' ("defendant") motion to dismiss Count Two of the indictment filed against him, namely, a charge for unlawful possession of a firearm as a prohibited person, 18 U.S.C. § 922(g)(5). **ECF No. 32**. Defendant asserts that this statute is unconstitutional both facially and as applied to him under Second and Fourteenth Amendments of the Constitution of the United States. Having reviewed defendant's objections (**ECF No. 40**)[3] and having performed a careful *de novo* review of the record and the law underpinning those objected portions of the R&R, the Court hereby **MODIFIES IN PART** and **ADOPTS** the R&R's recommendation and accordingly **DENIES** defendant's motion to dismiss.

## II.     Factual and Procedural Background

### A.     The parties' respective positions.

Defendant was arrested by agents of the Puerto Rico Police Bureau ("PRPB") on September 13, 2022, in the course of the execution of a state-issued search warrant of his residence. *See* Affidavit attached to Complaint, **ECF No. 1-1** at 2. PRPB agents found in his possession a rifle as well as 26 rounds of .223 caliber ammunition. *Id.* at 3. A grand jury returned an indictment charging him with improper entry by a noncitizen (8 U.S.C. § 1325(a)(2)) and

---

[3] The government opted not to file a response to defendant's objections.

possession of a firearm and ammunition by a noncitizen unlawfully present in the United States (18 U.S.C. § 922(g)(5)). **ECF No. 12**. The indictment describes the firearm as a Palmetto, Model PA-15 Multi, .233 caliber, bearing serial number SCD074492.

In his motion to dismiss, defendant attacks the constitutionality of 18 U.S.C. § 922(g)(5). To do so, he relies primarily on the application of *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022), in which the Supreme Court mandated a "history and tradition" test for laws that regulate conduct purportedly protected by the Second Amendment. U.S. Const. amend II. Defendant puts forth three main arguments under *Bruen*. First, that noncitizens unlawfully present in the United States are part of "the people" that the Second Amendment protects, making Section 922(g)(5) presumptively unconstitutional. **ECF No. 19** at 6-7 and 10-11. Second, that Section 922(g)(5) has no distinctly similar counterpart in the United States' historical tradition of firearms regulation and is thus unconstitutional on its face. *Id.*, at 7-10. Third, that his possession of a firearm in his home for self defense is conduct protected by the Second Amendment and as such, Section 922(g)(5) is unconstitutional as applied to him. *Id.*, 10-13.

The government, for its part, argues that Section 922(g)(5) is a lawful regulatory measure on the right to keep and bear arms for three reasons. First, the government rejects defendant's contention that he is part of "the people" to whom the Second Amendment applies because, as a noncitizen unlawfully present in the United States, he is neither a "law-abiding citizen" nor a member of the "the political community." **ECF No. 21**, at 4-8. Second, that at the time of its ratification in 1791, the Second Amendment was understood to protect the citizens' right to keep

and bear arms, but not that of persons who were not considered part of the political community, such as Native Americans, Catholics, and those who refused to swear oaths of allegiance. *Id.*, at 9-11. Third, that even if defendant were protected by the Second Amendment, Section 922(g)(5) would still be lawful as it is in keeping with the historical tradition of firearm regulations. *Id.*, at 11-14.

On reply, defendant further argues that the Second Amendment protects an individual right, and that the Court should not rely on pre-*Bruen* cases employing a "collective right" analysis. **ECF No. 23** at 2-6. Defendant also argues that because illegal immigration is a problem of relatively "recent provenance," there is "no longstanding history of disarming aliens" with which to compare Section 922(g)(5), and that, even if the Court were to consider analogous historical regulations based on race, religion, ethnicity, or national origin, these historical examples are "spotty history" and validating them would result in a violation of the Equal Protection Clause and the Civil Rights Act of 1964. *Id.*, at 6-9.

**B.    The Magistrate Judge's R&R.**

The Magistrate Judge considered the above arguments and issued his R&R, recommending that the Court deny defendant's motion to dismiss. **ECF No. 32**. The Magistrate Judge began by analyzing whether defendant's conduct was protected by the Second Amendment's plain text. *See id.*, at 5; *see also Bruen*, 597 U.S. at 17 ("…when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct."). The Magistrate Judge concluded that "[t]he Second Amendment

undoubtedly protects [defendant's] conduct" because "the Second Amendment's 'keep and bear arms' language plainly encompasses possession." **ECF No. 32** at 5 (citing *United States of America v. Jerowasky Wayne Collette*, 2022 WL 4476790, at *2 (W.D. Tex. Sept. 25, 2022)).

The Magistrate Judge next considered whether defendant, as a noncitizen unlawfully in the United States, is part of "the people" for purposes of the Second Amendment. The Magistrate Judge noted the lack of First Circuit guidance on this question, but reviewed decisions from other federal Courts of Appeal that have analyzed the same argument in the context of challenges to Section 922(g)(5). *See United States v. Portillo-Munoz*, 643 F.3d 437 (5th Cir. 2011); *United States v. Flores*, 663 F.3d 1022 (8th Cir. 2011); *United States v. Huitrón-Guizar*, 678 F.3d 1164 (10th Cir. 2012); *United States v. Carpio-León*, 701 F.3d 974 (4th Cir. 2012); *United States v. Meza-Rodríguez*, 798 F.3d 664 (7th Cir. 2015); *United States v. Torres*, 911 F.3d 1253 (9th Cir. 2019); *United States v. Pérez*, 6 F.4th 448 (2nd Cir. 2021); *United States v. Jiménez-Shilon*, 34 F.4th 1042 (11th Cir. 2022). Because these decisions predate *Bruen*, the Magistrate Judge then also considered two post-*Bruen* decisions, one by the U.S. District Court for Middle District of Pennsylvania in *United States v. DaSilva*, 21-CR-267, 2022 WL 17242870 (M.D. Pa. Nov. 23, 2022), and the other by the U.S. District Court of New Mexico in *United States v. Leveille*, 18-cr-02945-WJ, 2023 WL 2386266 (D.N.M. Mar. 7, 2023). Both decisions rejected the argument proposed by defendant that courts should not rely on pre-*Bruen* cases applying "collective-right" analysis to the right to bear arms. *See* **ECF No. 32** at 7-8.

In particular, the court in *Leveille* noted that *Bruen* did not address the question of whether noncitizens unlawfully present in the Untied States are part of "the people," and thus considered other sections of the Bill of Rights that have recognized protections for such persons. *See Leveille*, 2023 WL 2386266, at *2 (citing *United States v. Huitrón-Guizar*, 678 F.3d 1164, 1167 (10th Cir. 2012)). Using *Leveille* as a starting point, the Magistrate Judge extrapolated by citing to the First Circuit's decision in *Vieira García v. INS*, 239 F.3d 409 (1st Cir. 2001), for the proposition that the Equal Protection Clause of the Fourteenth Amendment, U.S. Const. amend. XIV, applied to noncitizens. *See* 239 F.3d at 414 ("There can be no doubt that aliens are entitled to equal protection of the law."). He also cited the Supreme Court's decision in *Plyler v. Doe*, 457 U.S. 202, 215 (1982), that recognized that noncitizens, even those present in the United States unlawfully, are protected under the Fifth and Fourteenth Amendments' Due Process Clauses, U.S. Const. amend. V, cl. 4, and amend. XIV, § 1, cl. 3, as well as the latter's Equal Protection Clause, *id.*, § 1, cl. 4. *See* **ECF No. 32** at 8. On these grounds, the Magistrate Judge "assume[d] without deciding that the Second Amendment's use of 'the people' includes at least some undocumented immigrants." *Id.*

Having decided that the Second Amendment protects defendant's conduct and having assumed that the protection extends to him as a noncitizen unlawfully in the United States, the Magistrate Judge proceeded to analyze whether Section 922(g)(5) is consistent with "the Second Amendment's text and historical understanding." *Id.*, at 8 (citing *Bruen*, 597 U.S. at 26). The Magistrate Judge weighted whether he should apply a stricter standard applicable when "a

challenged regulation addresses a general societal problem that has persisted since the 18th century," as defendant posited, or, as the government argued, an analogy-based standard applicable when the problem was "unimaginable at the founding." *Id.*, at 8-9. Relying on *Leveille*, *DaSilva* and *Jiménez-Shilon*, the Magistrate Judge opted for the latter approach and concluded that "[b]ecause Section 922(g)(5)(A) is relevantly similar to well-established and representative historical analogues, it is not facially unconstitutional under the Second Amendment." *Id.*, at 10-12. For these same reasons, the Court upheld Section 922(g)(5)(A) against defendant's as-applied challenge. *Id.*, at 12 ("The analysis above forecloses [defendant's] arguments.") and 13 (Second Amendment protections "do not apply to [defendant] for the reasons already discussed.").

Finally, the Magistrate Judge considered defendant's arguments under the Civil Rights Act of 1968 and the Equal Protection Clause, concluding that the former was underdeveloped and waived. *Id.*, at 13-14. The Magistrate Judge addressed defendant's Equal Protection Clause challenge, analyzing whether Section 922(g)(5) impermissibly discriminates on the basis of alienage. *Id*. Applying a rational basis scrutiny applicable to Due Process challenges under the Fifth Amendment, the Magistrate Judge found that Congress did not violate the Fourteenth Amendment's Equal Protection Clause by enacting Section 922(g)(5). *Id.* at 14.

**C.    Defendant's objections to the R&R.**

Unsatisfied with the Magistrate Judge's determinations, defendant filed three objections to the R&R on May 12, 2023. **ECF No. 40**.[4] First, defendant objects to the Magistrate Judge's

---

[4] The Court had previously granted defendant an extension of time to do so. **ECF No. 38**.

conclusion that Section 922(g)(5) is "relevantly similar to well-established and representative historical analogues…." *Id.*, at 2-6. Defendant marshals several colonial-era legal authorities in support to argue that "there is no record of the founders disarming noncitizens based on their citizenship," that those disarmament laws based on allegiance are "too slender a reed on which to hang a historical tradition," and that even if these bear some resemblance to Section 922(g)(5), it would still be too broad of an analogy under *Bruen*. *Id.*, at 5 (citing *Bruen*, 597 U.S. at 58). Second, defendant restates his as-applied challenge on the same basis as his first objection. *Id.*, at 6. Third and finally, with regards to his Equal Protection argument, defendant briefly posits that the text of the Fourteenth Amendment does not cabin the Equal Protection Clause to only "citizens" but applies more broadly to "persons." Therefore, "every person should have the ability to defend themselves under the Second and Fourteenth Amendments [and Section] 922(g)(5) violates the Equal Protection Clause of the Fourteenth Amendment." *Id.*, at 7.

The Court notes that despite the importance and novelty of defendant's constitutional challenge to Section 922(g)(5), the government did not file a response to defendant's objections.

### III.    Legal Standard

Magistrate Judges are granted authority to make recommendations on pretrial matters dispositive of a claim or defense, while the ultimate resolution of dispositive motions remains at the discretion of the presiding judge. *See* 28 U.S.C. § 636(b); Fed. R. Civ. P. 72(a), (b)(1); *accord* L. Civ. R. 72(a)(7)-(9). Any party adversely affected by the recommendation issued may file written objections within fourteen (14) days of being served with the report and

recommendation. Fed. R. Civ. P. 72(b). A party that files a timely objection is entitled to a *de novo* determination of "those portions of the report or specified proposed findings or recommendations to which specific objection is made." *Sylva v. Culebra Dive Shop,* 389 F. Supp. 2d 189, 191–92 (D.P.R. 2005) (citing *United States v. Raddatz,* 447 U.S. 667, 673 (1980)). "The district court need not consider frivolous, conclusive, or general objections." *Rivera-García v. United States,* Civ. No. 06–1004 (PG), 2008 WL 3287236, *1 (D.P.R. Aug. 7, 2008) (citing *Battle v. U.S. Parole Comm'n,* 834 F.2d 419 (5th Cir. 1987)). However, the Court is free to "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate-judge." 28 U.S.C. § 636(b)(1); *see also Templeman v. Chris Craft Corp.,* 770 F.2d 245, 247 (1st Cir. 1985); *Alamo Rodríguez v. Pfizer Pharma., Inc.,* 286 F. Supp. 2d 144, 146 (D.P.R. 2003). The court may accept those parts of the report and recommendation to which the party does not object. *See Hernández-Mejías v. General Elec.,* 428 F. Supp. 2d 4, 6 (D.P.R. 2005) (citing *Lacedra v. Donald W. Wyatt Detention Facility,* 334 F. Supp. 2d 114, 125-26 (D.R.I. 2004)).

When reviewing a defendant's motion to dismiss an indictment, the reviewing court "must not inquire into the sufficiency of the evidence underlying the indictment," rather, the court must consider "'whether the allegations in the indictment are sufficient to apprise the defendant of the charged offense.'" *United States v. Stepanets*, 879 F.3d 367, 372 (1st Cir. 2018) (quoting *United States v. Savarese*, 686 F.3d 1, 7 (1st Cir. 2012)). In doing so, "courts take the facts alleged in the indictment as true…" and "routinely rebuff efforts to use a motion to dismiss as a way to test the sufficiency of the evidence behind an indictment's allegations." *United States v.*

*Ngige*, 780 F.3d 497, 502 (1st Cir. 2015) (citing *Guerrier*, 669 F.3d at 4). A "technically sufficient indictment handed down by a duly impaneled grand jury is enough to call for trial of the charge on the merits." *Id.* (citations omitted).

## IV.    Analysis

Over two hundred years after the ratification of the Bill of Rights, the Supreme Court in *District of Columbia v. Heller*, 554 U.S. 570 (2008), first held that the Second Amendment protects an individual's right to keep and bear arms for self-defence. Two years later, in *McDonald v. Chicago*, 561 U.S. 742 (2010), the Supreme Court incorporated this individual right, making it applicable to the states via the Fourteenth Amendment. In the years after *Heller* and *McDonald*, the First Circuit, as well as every other federal appeals court, devised and implemented a two-step test to evaluate the constitutionality of firearm regulations under the Second Amendment. *See, e.g., Gould v. Morgan*, 907 F.3d 659, 669 (1st Cir. 2018) *abrogated by Bruen*. Under this test, courts would first ask whether the challenged law burdens conduct that fell within the scope of the Second Amendment. "This [was] a backward-looking inquiry, which [sought] to determine whether the regulated conduct was understood to be within the scope of the right at the time of ratification." *Id.* (quotation marks omitted). If the conduct did indeed fall within the purview of the Second Amendment, the court would have to "determine what level of scrutiny [was] appropriate and… proceed to decide whether the challenged law survive[d]…." *Id.*

The Supreme Court did away with this test in *Bruen*, explicitly forbidding the application of means-end scrutiny to firearm regulations under the Second Amendment. *See Bruen*, 597 U.S.

at 24. In its place, it announced a novel two-step test which purports to further refine the history and tradition analysis applied in *Heller*. Under *Bruen*, courts must first determine whether the Second Amendment's plain text covers the regulated conduct, and if so, then whether the government can demonstrate that the regulation is consistent with the United States' historical tradition of firearm regulations. *Id.*, at 17.[5]

Here, the Magistrate Judge applied *Bruen's* two-step test and concluded that Section 922(g)(5) passes constitutional muster. Defendant's objections do not pertain to the Magistrate Judge's analysis at step one, so the Court will review that portion of the R&R only for clear error. On the other hand, defendant's first and second objections directly relate to the Magistrate Judge's analysis at step two. That portion of the R&R will be reviewed *de novo*. Defendant's third and final objection relates only to his Equal Protection challenge. The Magistrate Judge concluded that this challenge failed.[6] The Court will therefore also review this determination *de novo*.

---

[5] Although the Supreme Court's formulation of the first step focuses on the *conduct* purportedly covered by the Second Amendment, there is reason to believe that courts need also evaluate whether the individual challenging the regulation is included in "the people" and whether the firearm in question is covered by amendment's use of the term "arms". *Bruen*, 597 U.S. at 31-32 (examining whether the challengers were "part of 'the people' whom the Second Amendment protects" and establishing that "handguns are weapons 'in common use' today for self-defense" before turning to "whether the plain text of the Second Amendment" protected the regulated conduct.). *See also* discussion *infra*, Part IV.A.

[6] Defendant also mentioned a violation of the "Civil Rights Act of 1964" but the Magistrate Judge correctly concluded that any argument based thereon was waived as undeveloped. **ECF No. 32** at 13. The Court agrees with the Magistrate Judge's conclusion and will not address it. *See United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990).

**A. *Bruen's* step one: whether the Second Amendment is applicable to defendant and/or his conduct.**

Under *Bruen's* first step, the Magistrate Judge analyzed both whether the regulated conduct (possessing and carrying of firearms) and the defendant (as a noncitizen unlawfully present in the United States) were covered within the plain text of the Second Amendment. **ECF No. 32**, at 4-8. Having answered the first question in the affirmative, the Magistrate Judge then concluded that he could assume, without deciding, that defendant was indeed protected by the Second Amendment. *Id.*, at 8.

There is a divergence of opinion in the federal courts on whether any analysis on a person's inclusion in "the people" is necessary to evaluate constitutional challenges under the Second Amendment. *See, e.g., United States v. Bartucci*, No. 119CR00244ADABAM, 2023 WL 2189530, at *5-6 (E.D. Cal. Feb. 23, 2023) (noting existence of methodological split among courts, as well as "competing ways of determining what groups of people fall within the Second Amendment's scope of protections…."). The Fifth Circuit in *United States v. Rahimi*, 61 F.4th 443, 452-53 (5th Cir. 2023), *cert. granted*, 143 S. Ct. 2688 (June 30, 2023),[7] chose a pure "conduct-based" approach to *Bruen's* step one, considering it more attuned to both *Heller* and *Bruen*. 61 F.4th at 452. Some district courts have adopted this same approach. *See, e.g., United States v. Kays*, 624 F. Supp. 3d 1262, 1265 n. 4 (W.D. Okla. 2022) ("…the Court reiterates that an individual's Second Amendment rights are not predicated on their classification, but rather, their conduct."); *United*

---

[7] The Supreme Court heard oral argument in *United States v. Rahimi*, No. 22-915, on November 7, 2023, but has yet to publish its decision as of the date of this Opinion & Order.

*States v. Quiroz*, 629 F. Supp. 3d 511, 516 (W.D. Tex. 2022) ("*Bruen*'s first step… requires only that 'the Second Amendment's plain text cover the *conduct*.'… Therefore, whether the Government can restrict that specific conduct for a specific group would fall under *Bruen*'s second step: the historical justification for that regulation.").

On the other hand, other courts have considered at *Bruen's* first step whether certain persons are excluded from the Second Amendment's protections. The Ninth Circuit has employed a three-factor inquiry that includes that very question: "whether the challenger is part of the people whom the Second Amendment protects, whether the weapon at issue is in common use today for self-defense, and whether the proposed course of conduct falls within the Second Amendment." *United States v. Alaniz*, 69 F.4th 1124, 1128 (9th Cir. 2023). In *Range v. Atty. Gen. U.S. of Am.*, 69 F.4th 96 (3d Cir. 2023) (en banc), the Third Circuit, writing *en banc*, employed a two-factor inquiry that focuses on "the people" and the regulated conduct, much as the Magistrate Judge did here. 69 F.4th at 101 ("After *Bruen*, we must first decide whether the text of the Second Amendment applies to a person and his proposed conduct."). And, most relevant here, the Eighth Circuit in *United States v. Sitladeen*, 64 F.4th 978 (8th Cir. 2023) considered the question dispositive, holding that Section 922(g)(5) survived constitutional scrutiny under *Bruen* because noncitizens unlawfully present in the United States "are not part of the people to whom the protections of the Second Amendment extend." 64 F.4th at 987.

In any case, because neither defendant nor the government objected to this portion of the R&R, and because the Magistrate Judge essentially bypassed the issue in favor of defendant and

moved on to *Bruen's* second step, this specific question is not material to the resolution of defendant's objections.[8] Nonetheless, the Court notes that it is largely in agreement with the Magistrate Judge's approach. While the matter has not yet been addressed by the First Circuit, other courts have assumed, without deciding, that at least some noncitizens unlawfully present in the United States are protected by the Second Amendment and have proceeded to analyze the constitutionality of the challenged regulation. *See, e.g., Jiménez-Shilon*, 34 F.4th at 1045; *Pérez*, 6 F.4th at 453; *Torres*, 911 F.3d at 1257; *Huitrón-Guizar*, 678 F.3d at 1169.[9] All of this to say that the Court considers that the Magistrate Judge committed no error[10] in assuming, without deciding, that the protections of the Second Amendment extend to defendant as a noncitizen unlawfully present in the United States.[11]

---

[8] At *Bruen's* second step, discussed further below, the Court nonetheless must address how and why 17th and 18th century regulations disarmed certain classes or groups of people. This historical analysis, in practice, is functionally similar to asking whether noncitizens unlawfully present in the United States were meant to be included as part of "the people" protected by the Second Amendment. The Court thus wonders whether a two-step process is even useful in the context of a status-based regulation such as Section 922(g)(5). If the historical record evinces a tradition of disarming groups analogous to that regulated by the statute at issue (step two), that tradition could itself be probative as to whether this group was ever part of "the people" protected by the Second Amendment at the time of its ratification (step one). Therefore, a *Bruen* step-two analysis may end up yielding a step-one conclusion—that is, supposing "the people" is an appropriate unit of textual analysis under *Bruen's first* step.

[9] While these cases were resolved prior to *Bruen*, their historical analysis does not imply the type of means-end scrutiny that *Bruen* explicitly forbade and continue to be persuasive authority.

[10] The Court nevertheless notes that the Magistrate Judge's citation to *Vieria García v. INS*, 239 F.3d 409 (1st Cir. 2001), at page 8 of the R&R is not entirely apposite to the case at hand because the petitioner there was a permanent resident, not a noncitizen unlawfully present in the United States. *See* 239 F.3d at 411. This, however, does not affect this Court's conclusion that he did not clearly err in assuming that defendant is protected by the Second Amendment.

[11] The very same methodology was used by a sister Court in this District. *See United States v. Vizcaíno-Peguero*, 671 F. Supp. 3d 124, 127-28 (D.P.R. 2023); *United States v. Trinidad-Nova*, 671 F. Supp. 3d 118, 121-22 (D.P.R. 2023).

Separately, the Court is compelled to note that there is an issue that has remained unaddressed regarding whether the *conduct* or the *arms* implicated in the possession of an *illegally* obtained firearm are protected by the Second Amendment. Whether a person's possession of an illegally obtained firearm, regardless of any status-based prohibition, entitles him or her to raise a Second Amendment challenge is an issue that, in this Court's view, is not conclusively settled by either *Heller* or *Bruen*. Likewise, neither party raised nor addressed the question here.[12]

*Heller* held that the possession of a handgun in the home for self-defense was protected conduct under the Second Amendment. *Heller*, 554 U.S. 634. *Bruen* held that such protection extends outside of the home. *Bruen*, 597 U.S. at 10. But both cases proceeded on the assumption that the protected conduct and arms were, respectively, the possession of an otherwise *legally* obtained handgun—that is, obtained through established legal channels. Does the Second Amendment analysis change if the firearm were to be obtained through unlawful means? Would possession of a stolen gun, for example, entitle a person to invoke the Second Amendment to challenge a status-based restriction like those in Section 922(g)? Or to challenge any law outlawing his or her right to keep and bear arm for individual self-defense? Would such *possession* imply *conduct* not covered by the Second Amendment? *See Heller*, 554 U.S. at 626 ("Like most rights, the right secured by the Second Amendment is not unlimited. From Blackstone

---

[12] The Court disclaims any judgment on whether the firearm found in defendant's possession here was legally or illegally obtained, as those facts are not in the record before it at this stage.

through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose."); *see also*, *United States v. Trinidad*, No. CR 21-398 (SCC), 2022 WL 10067519, at *3 (D.P.R. Oct. 17, 2022) (raising similar concerns as to *Bruen* challenge to felon-in-possession prohibition, 18 U.S.C. § 922(g)(1)).

These are interesting questions, ones that may either go to *Bruen's* step-one analysis or, arguably, a yet-undeveloped theory of Second Amendment standing. Given the difference between the facts at issue in *Bruen* and *Heller* and those involving status-based prohibitions, the Court is of the opinion that these questions remain open, and their answer may have implications on criminal defendants' ability to raise Second Amendment challenges.

**B.** ***Bruen's* step two: whether the government can demonstrate that Section 922(g)(5)(A) is consistent with the historical tradition of firearm regulation.**

Proceeding to *Bruen's* second step, the Magistrate Judge analyzed both defendant's and the government's dueling interpretations of the United States' historical tradition of firearm regulations. His conclusion that there are sufficiently analogous historical regulations to uphold Section 922(g)(5) is the focus of defendant's first and second objections.

Under this step, the Court must weigh whether the government has demonstrated that the challenged regulation "is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24. As to what period in history is most relevant for this analysis, the Supreme Court recalled that "[c]onstitutional rights are enshrined with the scope they were

understood to have *when the people adopted them*." *Id*., at 34 (quoting *Heller*, 554 U.S. at 634–635). It strongly implied that the late 18th century "Founding Era" was the relevant period for Second Amendment analysis. *Id*., at 37 ("[W]e have generally assumed that the scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791."). However, it recognized an open question as to whether the ratification of the post-Civil War amendments should be equally, if not more, relevant to ascertaining the meaning of the Second Amendment and other rights. *Id*. ("We also acknowledge that there is an ongoing scholarly debate on whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868 when defining its scope (as well as the scope of the right against the Federal Government)."). But because "the public understanding of the right to keep and bear arms in both 1791 and 1868 was, for all relevant purposes, the same with respect to public carry," the Supreme Court elected not to decide the matter. *Id*., at 38.

For present purposes, the Court will focus here on firearm regulations dating to the period before, up to, and right after the adoption of the Second Amendment in 1791, which is the period in which the parties have largely based their arguments on. In addition, because defendant is challenging a federal law and not a state law, it seems more appropriate, at least on the surface, that the Court look to the period surrounding the Second Amendment's

ratification in 1791 instead of the Fourteenth's in 1868.[13] Therefore, the Court proceeds by assuming, without deciding, that the relevant period for the *Bruen* step-two inquiry as applicable to Section 922(g)(5)(A) is the Founding Era.

As to the burden of persuasion, it rests on the government, but its weight may vary depending on the regulation at issue. *Bruen* distinguished between firearm regulations addressing "a general societal problem that has persisted since the 18th century" and those addressing "unprecedented societal concerns or dramatic technological changes." *Id.*, at 26-27. In the case of the former, the "inquiry will be fairly straightforward" and the Court should consider as relevant evidence *if* and *how* the earlier generations regulated the "general societal problem."[14] In the case of the latter, however, there may not be a straightforward historical counterpart, so the Court should take into account historical analogues that are "relevantly similar" to the challenged regulation. *Id.*, at 29.

---

[13] The Supreme Court's bypassing of the question regarding the relevant historical period in *Bruen* might not have been significant there. Nevertheless, the Court notes that neither *Bruen, McDonald*, nor *Heller* involved a federal status-based firearm regulation, much less one based on alienage. Whether the period leading up to and immediately after the ratification of the Fourteenth Amendment in 1868 is relevant to analyzing the constitutionality of such laws under the Second Amendment (and to what degree) is a question that remains open—and one that neither the government nor defendant briefed in any significant detail here.

[14] "For instance, when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation is relevant evidence that the challenged regulation is inconsistent with the Second Amendment. Likewise, if earlier generations addressed the societal problem, but did so through materially different means, that also could be evidence that a modern regulation is unconstitutional. And if some jurisdictions actually attempted to enact analogous regulations during this timeframe, but those proposals were rejected on constitutional grounds, that rejection surely would provide some probative evidence of unconstitutionality." *Bruen*, 597 U.S. at 26-27.

The Supreme Court provided two "metrics" for this latter approach: "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.*, at 29 (citing *Heller* and *McDonald*). It further specified that "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are 'central' considerations when engaging in an analogical inquiry." *Id.* The Supreme Court also advised that "analogical reasoning under the Second Amendment is neither a regulatory straightjacket nor a regulatory blank check…. [A]nalogical reasoning requires only that the government identify a well-established and representative historical *analogue*, not a historical twin." *Id.* at 30.

Rather than being an "either-or" standard, the Court understands *Bruen's* step two to be a holistic one. The Court must employ reasoning by comparison whether or not the "general societal problem" that the challenged regulation seeks to address has persisted since the 18th century. The distinction simply illustrates the extremes within the inquiry and does not impose a dueling set of standards. In other words, whether one would call it reasoning by comparison or by analogy, the logical exercise is essentially the same: to identify and evaluate the similarity between the challenged regulation and comparable historical examples. In some cases, as the Supreme Court explains, the inquiry will require a direct counterpart or ancestor to the modern regulation. That is the situation that occurred in *Heller*, which figures prominently in *Bruen* as an example of such scenarios. *Bruen*, 597 U.S. at 27. But in other cases, a less direct but sufficiently analogous example will be enough.

Therefore, the Court will first determine whether Section 922(g)(5)(A) addresses a "general societal problem" that has persisted since the 18th century or if it is one of more recent vintage. To do so, the Court will begin with the "how" and "why" of Section 922(g)(5)(A) and then compare it to the "how" and "why" of statutes that form part of the historical tradition of firearm regulation in the United States.

### 1. The history and purpose of Section 922(g)(5)(A).[15]

The text and structure of Section 922(g) is relatively straightforward. It begins and ends with a proscription: "It shall be unlawful for any person… to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition possess firearms; or… receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce." 18 U.S.C. § 922(g). The filling in between is what is of concern here. Section 922(g)(1) through (9) includes a defined list of categories of persons to which the proscription applies, which includes noncitizens unlawfully or illegally present in the United States. 18 U.S.C. § 922(g)(5)(A). This list, in its modern form and location within Title 18 of the U.S. Code, has its origins in the Firearms Owners' Protection Act ("FOPA"), Pub. L. No. 99-308, § 102(6)(C), 100 Stat. 449 (1986). But by enacting Section 922(g), FOPA merely transplanted what had been section 1202(a) of Title VII of the Omnibus Crime Control and Safe Streets Act of 1968,

---

[15] The Court's inquiry into the purposes behind Section 922(g)(5)(A) is not undertaken to ascertain the meaning or interpret the text of the statute, neither of which is in dispute. It is limited to identifying the "general societal problem" it seeks to address, consistent with *Bruen*.

Pub. L. No. 90-351, § 1202, 82 Stat. 197 ("Omnibus Act"), as amended. *See* Jacob D. Charles and

Brandon L. Garrett, *The Trajectory of Federal Gun Crimes*, 170 U. Pa. L. Rev. 637, 663 (2022).

It was in the 1968 Omnibus Act that Congress first prohibited the possession of firearms

by specifically enumerated categories of people. *Id.*, at 654.[16] This original list had only five

categories, including noncitizens "illegally or unlawfully in the United States"—a language

substantially identical to that of Section 922(g)(5)(A). *Compare* Pub. L. No. 90-351, § 1202 *with* 18

U.S.C. § 922(g)(5)(A).[17]

Notwithstanding its ground-breaking nature, section 1202(a)—as well as the rest of Title

VII—was only included as a late amendment to the Senate bill that would become the Omnibus

Act (S. 917, 90th Cong. (1968)), one that was "hastily passed, with little discussion, no hearings

and no report." *United States v. Bass*, 404 U.S. 336, 344 (1971). Consequently, the legislative

history on this amendment is far from abundant. But what little record there is provides valuable

guidance for the Court's inquiry into the *why* behind section 1202(a)'s prohibited person list.

---

[16] Nevertheless, by that time some states had been limiting or outright prohibiting the possession of firearms by noncitizens for several decades under different pretenses. *See* Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 Wyo. L. Rev. 249, 272-73 (2020) (citing state laws from 11 different states enacted between 1909 to 1925). In addition, the Federal Firearms Act, Pub. L. No. 75-785, § 2(a), 52 Stat. 1250 (1938), already included a list of categories of persons prohibited from certain firearm-related activities, although not the mere possession of such. *See* Charles & Garrett, *supra*, at 651 ("Fugitives and those under indictment for or convicted of a crime of violence were forbidden from shipping or transporting firearms in interstate commerce or receiving guns that had been so shipped or transported. They were not, however, forbidden from merely *possessing* such firearms, as later legislation would provide.").

[17] Section 922(g)(5)(B), which is not at issue here, was included decades later in the Omnibus Consolidated and Emergency Supplemental Appropriations Act, 1999, Pub. L. 105-277, § 121(1), 112 Stat. 2681 (1998), and extends the prohibition to noncitizens present in the United States under a nonimmigrant visa as defined in 18 U.S.C. § 1101(a)(26), with limited exceptions. *See* 18 U.S.C. § 922(g)(5)(B) and (y)(2).

To start, the Supreme Court has provided some pointed observations on Title VII. In

*United States v. Bass*, cited above, the Supreme Court reviewed the "meager legislative history"

of Title VII's enactment in the context of analyzing the reach of section 1202's prohibitions vis-

à-vis interstate commerce. 404 U.S. at 338. It made the following observation:

> On the Senate floor, Senator [Russel B.] Long, who introduced [Section] 1202,
> described various evils that prompted his statute. These evils included
> assassination of public figures and threats to the operation of businesses
> significant enough in the aggregate to affect commerce. Such evils, we note, would
> be most thoroughly mitigated by forbidding every possession of any firearm by
> specified classes of especially risky people, regardless of whether the gun was
> possessed, received, or transported "in commerce or affecting commerce."

404 U.S. at 345. A few years later, in *Barrett v. United States*, 423 U.S. 212 (1976), the Supreme

Court spoke with more clarity when it stated that through the Omnibus Act (as amended by the

Gun Control Act of 1968, Pub. L. 90-618, 82 Stat. 1213), Congress "sought broadly to keep

firearms away from the persons [it] classified as potentially irresponsible and dangerous." 423

U.S. at 502. A year later, in *Scarborough v. United States*, 431 U.S. 563 (1977), after reviewing Title

VII's legislative history "in its entirety," the Supreme Court observed that it "supports the view

that Congress sought to rule broadly to keep guns out of the hands of those who have

demonstrated that 'they may not be trusted to possess a firearm without becoming a threat to

society.'" 431 U.S. at 572 (quoting 114 Cong. Rec. 14,773). Three years later, it noted in *Lewis v.*

*United States*, 445 U.S. 55 (1980) that "[t]he legislative history of the gun control laws [i.e., Titles

IV and VII of the Omnibus Act] discloses Congress' worry about the easy availability of firearms,

especially to those persons who pose a threat to community peace." 445 U.S. at 66. It then made

essentially the same observation a few years later in *Ball v. United States*, 470 U.S. 856 (1985): "The legislative history of… [section] 1202(a)… disclose[s] 'Congress' worry about the easy availability of firearms, especially to those persons who pose a threat to community peace.'" 470 U.S. at 862 (citations omitted).

The congressional debates surrounding Title VII's inclusion in the Omnibus Act support the Supreme Court's observations. Title VII's proponent, Senator Russel B. Long of Louisiana, introduced it as an amendment to S. 917 on May 17, 1968. *See* 114 Cong. Rec. 13,867. In his introduction, Senator Long explained that "we do not want the murderers, the burglars, the rapists, the looters, or the arsonists armed to the teeth and walking the streets. We do not want the habitual criminals who have committed all sorts of crimes armed and presenting a hazard to law-abiding citizens." 114 Cong. Rec. 13,868. Using the assassinations of President John F. Kennedy and Reverend Martin Luther King, Jr. as a backdrop, Senator Long went through the list of categories of persons that would be prohibited from possessing firearms.[18] Regarding noncitizens, he explained that "if [the person] is an alien who is illegally in the United States, he should not be carrying firearms. He is one who should not be trusted to carry firearms." *Id.* Senator Long made similar conclusory statements about each of Section 1202(a)'s categories of prohibited persons.

On May 23, 1968, Senator Long brought up his amendment for discussion in the Senate. 114 Cong. Rec. 14,772. On this occasion, he was more direct as to his reason for prohibiting

---

[18] Reverend Martin Luther King, Jr. had been assassinated less than two months prior, on April 4, 1968.

certain persons from possessing firearms: "The reason I particularly wanted these categories covered is that this would make it apply to the gun Oswald has with which he killed John F. Kennedy." *Id.* He also introduced into the legislative record a memorandum supporting the inclusion of his amendment, which explained that the prohibited person list "described persons who, by their actions, have demonstrated that they are dangerous, or that they may become dangerous. Stated simply, they may not be trusted to possess a firearm without becoming a threat to society." 114 Cong. Rec. 14,773. That same day, although the amendment was at first to be sent to committee for further consideration, the Senate ended up voting on it and approved it without any further consideration. 114 Cong. Rec. 14,775.

Two weeks later, upon consideration in the House of Representatives, S. 917 (originally H.R. 5037, 90th Cong. (1968)) was approved without amendment on June 6, 1968.[19] Before the vote, several representatives spoke at length about the legislation. Of those representatives that voiced their support, one described Title VII's prohibited person list as one of the reasons he was voting for the bill. *See* 114 Cong. Rec. 16,273 ("…I am certain that the Nation wants some restrictions against weapons in the hands of criminals and mentally incompetent and irresponsible persons and I shall vote for this bill.") (statement of Rep. Waggoner). Another considered the prohibited categories in Title VII as "necessary to a coordinated attack on

---

[19] *See* H.R. Res. 1197, 90th Cong. (1968). Former U.S. Attorney General, senator, and presidential candidate Robert F. Kennedy was shot with a firearm in the early hours of the day before and died in the morning of June 6. Strong sentiments as to the need for immediate action on the legislation are prevalent throughout the legislative debate of the day, which ended with the approval of a resolution to end further debate and immediately send S. 917 to President Lyndon B. Johnson for his signature. *See* 114 Cong. Rec. 16,271-300.

crime….” 114 Cong. Rec. 16,286 (statement of Rep. Machen). And yet another representative approvingly described Title VII's "overall thrust" as "prohibiting the possession of firearms by criminals or other persons who have specific records or characteristics which raise serious doubt as to their probable use of firearms in a lawful manner." 114 Cong. Rec. 16,298 (statement of Rep. Pollock).

Finally, the text of the statute itself offers telling clues as to its purposes. Section 1201 of Title VII includes Congress' findings and declarations. There, Congress expressly stated that "the receipt, possession, or transportation of a firearm" by certain classes of individuals, including noncitizens unlawfully in the United States, constituted:

(1) A burden on commerce or threat affecting the free flow of commerce,
(2) A threat to the safety of the President of the United States and Vice President of the Untied States,
(3) An impediment or a threat to the exercise of free speech and the free exercise of a religion guaranteed by the first amendment to the Constitution of the United States, and
(4) A threat to the continued and effective operation of the Government of the United States and of the government of each State guaranteed by article IV of the Constitution.

Pub. L. No. 90-351, §1201, 82 Stat. 197, 236 (1968). While this text could be interpreted as providing a statement of purposes behind Section 1202(a), the legislative debate reveals they were rather intended to provide constitutional grounding for the prohibition of mere possession of firearms. *See* 114 Cong. Rec. 13868 (statement of Sen. Long); *accord United States v. Bass*, 404 U.S. 336, 344 n. 14 ("But these findings of 'burdens' and 'threats' simply state Congress' view of

the constitutional basis for its power to act….”). Nonetheless, these four findings and declarations are probative as to the *why* behind Section 1202(a).

From the above review, the Court is comfortable concluding that the purpose of section 1202(a) of Title VII of the Omnibus Act was to address the possession of firearms by persons it deemed too untrustworthy or dangerous to public safety and to the government to possess firearms. Congress deemed noncitizens unlawfully present in the United States to be in that category of persons. Therefore, the possession of firearms by persons deemed too dangerous or untrustworthy is the “general societal problem” that Section 922(g)(5)(A), the modern incarnation of Section 1202(a), seeks to address.

### 2. Whether the “general societal problem” addressed by Section 922(g)(5)(A) is persistent or unprecedented.

Having concluded as much, the Court will now determine if this “general societal problem” has persisted since the 18th century or if it implicates “unprecedented societal concerns.” *Bruen*, 597 U.S. at 26-31. This will in turn determine whether the government must hew closer to a tradition of “distinctly similar” regulations to uphold Section 922(g)(5) or if it can accomplish its goal by presenting analogous regulations that are “relevantly similar” to it. At this stage, *Bruen* requires thoughtful consideration of the legal and historical context of the Second Amendment at the time it was ratified. In the case of Section 922(g)(5)(A), this presents a wrinkle which the Court must first iron out.

The sole criterion that makes a noncitizen a "prohibited person" under Section 922(g)(5)(A) is the unlawfulness of his or her presence in the United States. That, in turn, is determined by the immigration system set up by Congress in the Immigration and Nationality Act, 8 U.S.C. § 1101 *et seq.*, and other statutes.[20] The problem is that one cannot apply this criterion to the Founding Era United States because the "unlawfulness" of a noncitizen's presence in the country seems to not have been a familiar legal concept in late 18th century. As the government explains:

> The relevant phenomenon of *illegal* immigration is one of more recent provenance than the Second Amendment…. In the context of a country that initially drew no connection between the manner of an immigrant's arrival and lawbreaking, there was no need to explicitly restrict any immigrant's possession of firearms (even if the common understanding was that noncitizens had no affirmative *right* to bear arms)."

**ECF No. 21** at 14. Defendant, for his part, echoes the government's position in that "…there is no longstanding history of disarming immigrants as illegal immigration is a new phenomenon in comparison to the Second Amendment…." **ECF No. 23** at 6-7. And while defendant would have the Court stop here and rule in its favor due to the lack of a "distinctly similar regulation," the reason for this historical silence persuades the Court to go further.

To start, the United States had nothing resembling federal immigration controls in place until at least the late 19th century. *See Kleindienst v. Mandel*, 408 U.S. 753, 761 (1972) ("Until 1875

---

[20] Chronologically, the Immigration and Nationality Act, Pub. L. 82-414, was enacted on June 27, 1952, and later amended by an identically titled law, Pub. L. 89-236, on October 3, 1965. Both were enacted prior to the Omnibus Act, which, as explained above, first established as a crime the possession of firearms by noncitizens unlawfully present in the United States.

alien migration to the United States was unrestricted."); *but see* Gerald L. Neuman, *The Lost Century of American Immigration Law (1776-1875)*, 93 Colum. L. Rev. 1833 (1993) (arguing to the contrary based on state-level regulations of immigration-adjacent matters). The only notable prior exercises of federal legislative control over immigration were the much-debated Alien and Sedition Acts of 1798; in particular, the Naturalization Act, 1 Stat. 566, ch. 54, and the Alien Friends Act, 1 Stat. 570, ch. 58. The Naturalization Act required foreigners arriving in the United States to register with a government authority upon pain of being fined or imprisoned. 1 Stat. at 566 §§ 4, 5. The Alien Friends Act gave the President of the United States the unilateral power to expel any foreigner deemed to be a danger to the peace and safety of the country. 1 Stat. at 570-70 §§ 1, 2. However, these acts were never subjected to judicial scrutiny, *Ping v. United States*, 130 U.S. 581, 611 (1889), were heavily criticized at the time as "unconstitutional and barbarous," *Fong Yue Ting v. United States*, 149 U.S. 698, 747 (1893) (Brewer, J., dissenting), and were ultimately short lived, expiring two years after their enactment. Congress passed another Naturalization Act in 1802 that did not require registration if the person did not intend to become a citizen. *See* Act of April 14, 1802, 2 Stat. 153, ch. 28.

From then until the late 19th century, the federal government did not act to restrict the flow of immigration; rather, it encouraged it. *See* 1 Charles Gordon, Stanley Mailman, Stephen Yale-Loehr & Ronald Y. Wada, *Immigration Law and Procedure* § 2.02[1] (2023). Thus, for much of the early history of the country, the United States did not have exclusionary rules that, if broken,

could render immigrants as "illegal." Therefore, a noncitizen's presence in the country cannot be said to have been *per se* "unlawful" or "illegal" in the same sense as it would be today.[21]

The lack of federal immigration regulation strongly suggests that the Founding generation did not see the mere presence of noncitizens as a "general societal problem."[22] The above-cited Alien and Sedition Acts, moreover, only required registration of noncitizens, and the President's power of expulsion was not contingent on the "unlawful" or "illegal" status of the noncitizen. Their explanatory power in this regard is therefore minimal. Given the large gap in restrictive federal immigration regulations from thereon until the late 19th century, the most reasonable conclusion is that the unlawful status of a noncitizen's presence in the United States,

---

[21] *But see* Neuman, *supra* at 1898-1901 (offering a contrarian view and arguing that the Framers would have been familiar with illegal immigration as a concept but based on analogous state-level regulations).

[22] That is not to say that noncitizens were treated the same as citizens under the law. For instance, the early naturalization laws were notoriously restricted on the basis of race. *See United States v. Wong Kim Ark*, 169 U.S. 649, 701 (1898) ("For many years after the establishment of the original constitution, and until two years after the adoption of the fourteenth amendment, congress never authorized the naturalization of any one but 'free white persons.'") (collecting statutes). But as respects the question of immigrants and their rights in the early United States, the most valuable source of guidance may be the Framers' understanding of international law at the time of the Founding. *See* Sarah H. Cleveland, *Powers Inherent in Sovereignty: Indians, Aliens, Territories, and the Nineteenth Century Origins of Plenary Power over Foreign Affairs*, 81 Tex. L. Rev. 1, 87-88 (2002) ("Both the scope of constitutional and international law authority over aliens and the question of inherent powers were central to the debates over the Alien Act of 1798."). Indeed, the Supreme Court's validation of the federal government's plenary powers over immigration is reliant on the Framer's understanding of international law. *See, generally, Fong Yue Ting*, 149 U.S. 698 (1893). In that spirit, a valuable source for further research into how international law influenced the Founder's view of foreigners and noncitizens is Vattel's influential 1757 treatise on the law of nations. *See* Emmerich de Vattel, *The Law of Nations*, bk. I, ch. XIX, § 212-14 (1758) (J. Chitty ed., T. & J. W. Johnson 6th ed. 1844) (defining "citizens" and "inhabitants" as well as the process of naturalization); *see also*, *Franchise Tax Bd. of California v. Hyatt*, 587 U.S 230, 239 (2019) (describing Vattel as "the founding era's foremost expert on the law of nations."). Indeed, at least one scholar has suggested an 18th century analogue based on his work: "Aliens that did not comport to a nation's laws of settlement, according to Vattel, were vagrants—the eighteenth century equivalent of what we refer today as 'illegal' or 'unlawful' aliens." Patrick J. Charles, *The Plenary Power Doctrine and the Constitutionality of Ideological Exclusions: An Historical Perspective*, 15 Tex. Rev. L. & Pol. 61, 87 (2010). All of which suggests a possible relevant area for historical comparison under the *Bruen* inquiry.

and by extension, their possession of firearms, was not a general societal problem with which the Framer's dealt with in any significant manner.[23]

That leaves the Court in an awkward position. Even though "dangerous persons" possessing firearms seems to be the appropriate focus of analysis, the circumstances regarding the particular subset of persons at issue here were not yet present at the time of the Founding. Thus, the Court finds itself, conceptually, in much the same situation as the Fifth Circuit in its decision in *United States v. Daniels*, 77 F.4th 337 (5th Cir. 2023). There, the Fifth Circuit applied the *Bruen* test to Section 922(g)(3), which prohibits "unlawful users" of controlled substances from possessing firearms. 18 U.S.C. § 922(g)(3). The Fifth Circuit's approach to whether it should allow the government to prove its case by analogy turned on the question of defining the "general societal problem" that Section 922(g)(3) sought to address. Recognizing that it faced a level-of-generality problem, it concluded that it was appropriate to proceed by analogy because "the Founding generation… [was] not familiar with widespread use of marihuana as a narcotic, nor the modern drug trade." *Id.*, at 343; *see also id.*, at *344 (discussing rationale). Reasoning by analogy, the Fifth Circuit explained, allows courts to "compare the Founders' treatment of one problem to new problems that [they] could not have anticipated." *Id.*, at 344.

---

[23] Because neither party made a serious attempt to support their arguments on the history of immigration regulation or the treatment of foreigners and noncitizens in the Founding Era, the Court will not venture any further into this historical thicket. In any case, *Bruen* only requires examining the "historical tradition of firearm regulation," not of immigration regulation. But *Bruen*, as well as *McDonald* and *Heller* before it, did not involve status-based federal prohibitions on firearms possession. Whether a broader "history and tradition" scope is desirable or warranted under the Second Amendment in this context is something the Supreme Court has not yet addressed. *Cf. Huitrón-Guizar*, 678 F.3d at 1169 (posing the question of "[h]ow, historically, *has* this country regulated weapon possession by foreigners?" but ultimately avoiding the constitutional issue).

Faced with a similar level-of-generality problem, the Court here will employ the same approach. While Section 922(g) in general targets certain "dangerous persons," the specific prohibition here is based on the "unprecedented societal concern" of *illegal* immigration into the United States.[24] As shown above, the Founding generation did not consider a noncitizen's presence in the United States to be legally problematic or unlawful *per se*, at least in the same manner as it would be today. It would therefore be illogical to require that the government (or Congress, for that matter) rely on "distinctly similar" historical regulations to justify the constitutionality of Section 922(g)(5). The government must be afforded some leeway under *Bruen* to make its case by pointing to statutes that similarly reflect the disarmament (the *how*) of dangerous persons (the *why*).

3. **Historical tradition of the regulation of possession of firearms by groups analogous to noncitizens unlawfully present in the United States.**

"Courts are… entitled to decide a case based on the historical record compiled by the parties." *Bruen*, 597 U.S. at 25 n. 6.[25] Here, defendant pointed to a pre-existing right of the people,

---

[24] For this reason, the Court's Opinion & Order here should not be read to extend too broadly to the other categories of persons included in Section 922(g).

[25] Merely because the Court is entitled to rely on the parties' historical research does not imply that it is forbidden from doing its own or, for that matter, from inviting the views of experts or *amici*. It would be odd for the Supreme Court to require the lower courts to make sweeping and decisive pronouncement on history based exclusively on the historical research presented by the parties, whose resources and abilities to undertake the *Bruen* inquiry will vary from case to case. In this regard, the Court has benefited from the well-researched opinions of other district and circuit courts and from numerous works by legal scholars dedicated to the history of firearms regulation. For good measure, the Court has also made use of a well-known historical gun law repository maintained by the Duke Center for Firearms Law to verify the primary sources. *See Repository of Historical Gun Laws*, Duke Ctr. for Firearms L., https://firearmslaw.duke.edu/repository/search-the-repository/ (last visited Apr. 18, 2024). In order to assist future litigants and courts in future *Bruen* inquiries, when citing to Founding Era statutes, the Court will include a hyperlink to publicly available digitized scans of primary sources whenever possible.

not just of citizens, to bear arms as shown by several pre-ratification state constitutions. *See* **ECF No. 40** at 4 (citing to the pre-ratification constitutions of Massachusetts, North Carolina, Vermont, Pennsylvania, New York, and Virginia). According to defendant, there is no tradition of disarmament of noncitizens based on their lack of citizenship. *Id.* at 5. Defendant further argues that laws that disarmed persons due to their lack of allegiance to the state are "too slender a reed on which to hang historical tradition" because these were not widespread and were aimed, at least in part, at disarming people "exercising their right to freedom of conscience." *Id.*

But this, even if true, only gets him so far. Assuming that noncitizens enjoyed some right to bear arms at, prior to, or immediately after 1791, the relevant question nonetheless continues to be whether the government may restrict this "right" if the noncitizen is in the United States unlawfully. It requires testing precisely whether the "reed" bears the weight of tradition, and that requires examining the government's evidence.

The government proposed "relevantly similar" historical regulations as analogies to Section 922(g)(5)(A). It alluded to "abundant precedent before, during, and after the Revolutionary War for disarming nonmembers of the political community." **ECF No. 21**. But instead of providing direct examples, the government relied on references to other court opinions and the work of scholars to do the heavy lifting. For example, it relied on the Eleventh Circuit's opinion in *Jiménez-Shilon* and Second Circuit Judge Steven Menashi's concurring opinion in *Pérez* for the proposition that Native Americans were forbidden from carrying weapons in pre-ratification Massachusetts and Virginia. **ECF No. 21** at 12. The government also

relied on works from scholars to demonstrate that oaths of allegiance were required in certain colonies and early states in order to be able to possess arms. *Id.*, at 12-13 (citing Robert H. Churchill, *Gun Regulation, The Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 Law & Hist. Rev. 139 (2007); Saul Cornell & Nathan DeDino, *A Well-Regulated Right: The Early American Origins of Gun Control*, 73 Fordham L. Rev. 487 (2004)). Moreover, the government alluded to proposals made during the ratification conventions of New Hampshire and Massachusetts to emphasize the link between allegiance and the ability to carry arms. *Id.*, at 13 (citing 2 Bernard Schwartz, *The Bill of Rights: A Documentary History* 681, 761 (1971)). And the government also marshalled passages from *McDonald* and *Bruen* in support of the position that the right to bear arms was "connected to citizenship and to membership in and preservation of the political community." *Id.* All of this to conclude that "Section 922(g)(5) certainly does not 'burden a *law-abiding citizen's* right to armed self-defense.'" *Id.* (citing *Bruen*, 597 U.S. at 29).

The government's theory is persuasive, but only to a point. The Court has already determined that reasoning by analogy is appropriate, so it will accept the government's position that it need only propose "relevantly similar" analogies to uphold Section 922(g)(5)(A). Notwithstanding, the Court is not convinced that merely tethering the Second Amendment to the rights of citizens is enough given the Framers' use of the broader term "the people" in the Second Amendment. *See United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990) ("…'the people' protected by the… Second Amendment[ ]… refers to a class of persons who are part of

a national community or who have otherwise developed sufficient connection with this country to be considered part of that community."). Many court decisions that support a citizen-only interpretation of the Second Amendment's protection hinge on *Heller's* and *Bruen's* repeated use of the phrase "law-abiding, responsible citizens," but this characterization was ultimately *dicta*. *See Range v. Att'y Gen. United States of Am.*, 69 F.4th 96, 101 (3d Cir. 2023) (en banc); *see also*, *Rahimi*, 61 F.4th at 452 ("…*Heller's* reference to 'law abiding, responsible' citizens meant to exclude from the Court's discussion groups that have historically been stripped of their Second Amendment rights, i.e., groups whose disarmament the Founders 'presumptively' tolerated or would have tolerated."). The Court will not read too much into this phrase. *See Turkiye Halk Bankasi A.S. v. United States*, 598 U.S. 264, 278 (2023) ("[G]eneral language in judicial opinions should be read as referring in context to circumstances similar to the circumstances then before the Court and not referring to quite different circumstances that the Court was not then considering.") (cleaned up); *United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) ("Judicial opinions must not be confused with statutes, and general expressions must be read in light of the subject under consideration."). Holding that the right to keep and bear arms belongs only to the "citizens" subset of "the people" (and more precisely, only to the "law-abiding, responsible" subset of "citizens") would entail adopting an inconsistent reading of the word "the people" across the Constitution. *See Verdugo-Urquidez*, 494 U.S. at 264-66 (detailing the use of the term "the people" in several places in the Constitution); *see also Huitrón-Guizar*, 678 F.3d at 1167-1169

(exploring tension between *Heller's* and *Verdugo-Urquidez's* use of the constitutional term "citizens").

That said, the Court is amenable to the claim that the right to keep and bear arms has long been subject to exceptions as to certain groups of persons not deemed to be part of the political community, or so-called "political outsiders." If there is such a tradition, Section 922(g)(5) would pass the *Bruen* test.

### a. English and colonial laws disarming Catholics.

The government proposed that colonial statutes disarming Catholics are a proper analogue to Section 922(g)(5). The Court proceeds to examine the claim.

In England, Catholics were historically subject to several limitations on their rights due to their religious affiliation. *See* Patrick J. Charles, *The Plenary Power Doctrine and the Constitutionality of Ideological Exclusions: An Historical Perspective*, 15 Tex. Rev. L. & Pol. 61, 72-73 (2010); *see also id.*, at 73-74 (observing that this religious discrimination often relied on conceptions of allegiance). More specifically, Catholics were limited by statute on their ability to possess arms. *See* Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 Wyo. L. Rev. 249, 258-261 (2020); *see also* Churchill, *supra* at 155-56 (citing An Act for Ordering the Forces in the Several Counties of this Kingdom, 13 & 14 Charles I, c. 3 (Eng. 1662)). Most relevant here, the disarmament statutes in force in England during the 17th century relate to the English experience between the 1660 Stuart Restoration and the 1688 Glorious Revolution, where "the [Catholic] Stuart Kings Charles II and James II

succeeded" in using the law to disarm their Protestant enemies. *Heller*, 554 U.S. at 593 (citing the use of the 1671 Game Act); *see also Atkinson v. Garland*, 70 F.4th 1018, 1031 (7th Cir. 2023) *(*"The fear of James's Catholicism was a major factor behind Parliament's decision to turn the throne over to William of Orange and Mary, James II's Protestant daughter, thereby ending the Stuart dynasty and ushering the Hanovers.") (Wood, J., dissenting). As a result, the English Parliament acted in the English Bill of Rights to enshrine for "the [English] Subjects which are Protestants" the right to "have Arms for their Defence suitable to their Conditions, and as allowed by Law." 1 W. & M. Sess. 2, ch. 2, § 7 (Eng. 1689); *Heller*, 554 U.S. at 593. But it also disarmed those who refused to take an oath of allegiance to the new Protestant monarchy and the Church of England—an action directed at Catholics. *See* 1 W. & M., Sess. 1, ch. 15 (Eng. 1688) (titled "An Act for the better secureing the Government by disarming Papists and reputed Papists").

The right afforded to Protestants in the English Bill of Rights "was the predecessor to our Second Amendment." *Heller*, 554 U.S. at 593. And while this right travelled across the Atlantic to the colonies, the disarmament statute also made its way to America, being adapted and adopted by Virginia and Maryland in 1756 and in Pennsylvania in 1759. *See* Greenlee, *supra* at 263 nn. 87 and 88; 5 *The Statutes at Large of Pennsylvania From 1682 to 1801* at 627 (J. Mitchell & H. Flanders eds., 1898) (reproducing the 1757 Militia Act of Pennsylvania);[26] *but see* Churchill, *supra* at 157, n. 47 (casting into doubt the effectiveness of the Maryland statute).

---

[26] A digitized copy of volume 5 of *The Statutes at Large of Pennsylvania From 1682 to 1801* (1896) is publicly available at https://archive.org/details/statutesatlarge06martgoog/page/n4/mode/2up (last visited on Apr. 18, 2024).

Importantly, the year 1756 corresponds to the commencement of the Seven Year's War between England and France, a Catholic country. Some legal scholars correlate the enactment of the Maryland and Virginia statutes with the commencement of that conflict. *See* Michael A. Belesiles, *Gun Laws in Early America: The Regulation of Firearms Ownership, 1607-1794*, 16 Law & Hist. Rev. 567, 574 (1998); Greenlee, *supra* at 263. If seen as a political and socially protective measure, the disarmament of Catholics finds notable ancestors in prior English statutes expelling French Catholic aliens in England and restricting naturalization to Protestants. *See* Patrick J. Charles, *supra* at 72-73 (citing statutes). This conforms with the common law principle in 17th and 18th century England that a person's status as an "alien" was dependent on his or her allegiance, which was, in turn, inextricably tied to the country of birth. *Id.*, at 73-74 (citing to *Calvin's Case* (1608), 77 Eng. Rep. 377 (K.B.), 7 Co. Rep. 1a); *see also United States v. Wong Kim Ark*, 169 U.S. 649, 655-56 (1898) (citing *Calvin's Case* approvingly as the leading common law case on English nationality). In that sense, a person's country of birth was a valid basis for the English and colonial governments to deny rights or privileges an English subject would otherwise enjoy.

The above represent few but significant examples of government power to disarm a religious minority considered dangerous to political or social stability, a power that is rooted in the English precursor to the Second Amendment.[27] In other words, Catholics were subject to

---

[27] There are other examples of English and colonial disarmament of religious minorities. *See Range*, 69 F.4th at 122-26 (Krause, J., dissenting) (describing disarmament of Antinomians, Mennonites, Moravians, Quakers, and non-Anglican Protestants); *Daniels*, 77 F.4th at 351 n. 31 (describing disarmament of Antinomians and Quakers in addition to Catholics).

disarmament in England and the colonies because of their perceived threat to the stability of the country (having recently switched from a Catholic to a Protestant monarch) and the war effort against France in the colonies. As such, these disarmament statutes, although based on religious affiliation, nonetheless single out a particular "outsider" group for whom rights were traditionally limited and disarmed them for reasons of public safety. In that way, they can be considered analogous to Section 922(g)(5)(A).

### b. Founding Era laws disarming loyalists and disaffected persons.

In a similar vein, the government suggested that statutes disarming loyalists during the Revolutionary War, as well as statutes disarming those refusing to swear oaths of allegiance more generally, are comparable analogues. At least six colonies enacted statutes disarming persons who refused to swear oaths or affirmations of allegiance during the Revolutionary War. This was mainly at the urging of the Continental Congress which, on March 14, 1776, issued a resolve advising the colonies to "immediately cause all persons to be disarmed within their respective colonies, who are notoriously disaffected to the cause of America, or who have not associated, and shall refuse to associate, to defend, by arms, these united Colonies…." 4 *Journals of the Continental Congress, 1774-1789* at 205 (Worthington Chauncy Ford ed., 1906).

The colony of Massachusetts acted first, passing a law that disarmed "every male person above sixteen years of age, resident in any town or place in this colony" who neglected or refused to take an oath to defend the colonies and refuse aid to Great Britain. *See* Act of May 1, 1776, 5 *Acts and Resolves, Public and Private, of the Province of the Massachusetts Bay* at 479, ch. 21,

§ 1 (1886).[28] On July 19, 1776, Pennsylvania heeded the Continental Congress' call to disarm the so-called "non-associators," enacting a statute that authorized militia officers to confiscate "all the arms… which are in the hands of non-associators" but did not require an oath until the following year. *See* Act of July 19, 1776, 9 Stat. at Large of Pa. 11, ch. 729; Act of June 13, 1777, 9 Stat. at Large of Pa. 110, ch. 756, § 2, 4.[29] Virginia enacted its oath statute in 1777, requiring "all free born male inhabitants of this state, above the age of sixteen years, except imported servants during the time of their service" to swear an oath of allegiance under penalty of being disarmed, as well as being incapacitated from exercising certain civil rights and duties. *See Range*, 69 F.4th at 125 (Krause J., dissenting). Pennsylvania would later amend and restate its oath requirement in 1778 and 1779, maintaining its disarmament provision. *See*, *e.g.*, Act of March 31, 1779, 9 Stat. at Large of Pa. 346, ch. 836. In addition, Rhode Island, North Carolina, and New Jersey also enacted disarmament statutes based on loyalty oaths. *See United States v. Jackson*, 69 F.4th 495, 503 (8th Cir. 2023) (collecting statutes).

Although these laws were specific to a unique moment in the history of the country, some scholars have noted that the disarmament of "disaffected" persons survived past the end of the Revolutionary War in Pennsylvania and Massachusetts. *See* Act of March 4, 1786, 12 Stat. at Large of Pa. 178 ch. 1,206; Act of February 16, 1787, ch. 56, in *Acts and Laws of the Commonwealth*

---

[28] A digitized copy of *Acts and Resolves, Public and Private, of the Province of the Massachusetts Bay* (1886) is publicly available at https://archive.org/details/actsresolvespass6980mass/page/n3/mode/2up (last visited on Apr. 18, 2024).

[29] Pennsylvania's Statutes at Large collection is digitally available on the website of the Legislative Reference Bureau of Pennsylvania, https://www.palrb.gov/Preservation (last visited on Apr. 18, 2024).

*of Massachusetts, 1786-87* at 176-180, ch. 56 (1893);[30] *see also* Joseph Blocher & Caitlan Carberry,

*Historical Gun Laws Targeting "Dangerous" Groups and Outsiders, in New Histories of Gun Rights*

*and Regulation: Essays on the Place of Guns in American Law and Society* (Joseph Blocher et als. eds.,

forthcoming)   (manuscript   at   10),   available   at   https://ssrn.com/abstract=3702696

[https://perma.cc/JYL6-6U9C] (last visited Apr. 18, 2024) (citing Shay's Rebellion of 1786 in

Massachusetts and an 1868 post-civil war law from Kansas that disarmed anyone "who had ever

borne arms against the government of the United States."). But by themselves, these statutes do

not   offer   solid   support   for   the   constitutionality   of   Section   922(g)(5).   They   were,   after   all,

measures taken by fledgling governments in the midst of a war for independence. *See, e.g.,* Act

of March 13, 1789, 13 Stat. at Large of Pa. 222, ch. 1,396 (repealing the loyalty oath statutes and

describing them as "proper and expedient... during the late war when it was necessary," but no

longer so "since the restoration of peace and the establishment of government.").

Nonetheless, when coupled with the previously reviewed statutes disarming Catholics,

they do suggest that the scope of right to keep and bear arms was understood by the Framers to

be subject to one's allegiance to the government. Persons failing to offer such allegiance therefore

presented a danger to the early republic and the political community. *See Nat'l Rifle Ass'n of Am.,*

*Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives,* 700 F.3d 185, 200 (5th Cir. 2012)

("Although   these   Loyalists   were   neither   criminals   nor   traitors,   American   legislators   had

---

[30] A digitized copy of *Acts and Laws of the Commonwealth of Massachusetts, 1786-87* is publicly available at https://archive.org/details/actsresolvespass178687mass/page/n7/mode/2up (last visited on Apr. 18, 2024).

determined that permitting these persons to keep and bear arms posed a potential danger.").  In that sense, both English and colonial statutes that disarmed persons on the basis of a perceived lack of allegiance support the view that the Second Amendment today would not bar analogous restrictions.

### c.  Colonial laws disarming Native Americans.

The government also proposed colonial statutes disarming Native Americans as analogous to Section 922(g)(5). From the outset, the Court notes that the disarmament reflected by many of these laws and ordinances was likely based on the persistent state of conflict between the native inhabitants of the continent and the colonists, not to mention the racial animosity such conflicts engendered. *See*, *generally*, Ann E. Tweedy, *"Hostile Indian Tribes . . . Outlaws, Wolves, . . . Bears . . . Grizzlies and Things Like That?" How the Second Amendment and Supreme Court Precedent Target Tribal Self-Defense*, 13 U. Pa. J. Const. L. 687, 697-704 (2011). As colonization progressed, so did legal attitudes towards Native Americans and their ability to possess firearms in the various colonies and states.

An early example is the colony of Virginia. In 1633, the colony prohibited "all trade with the savages…." Act XLVI of February 24, 1631, in 1 *The statutes at large; being a collection of all the laws of Virginia, from the first session of the legislature, in the year 1619* at 173 (William Waller Henning, ed., 1821) (hereinafter, "*Henning's Statutes at Large"*).[31] In 1642, the colony repealed the

---

[31]  A digitized copy of volume 1 of *Henning's Statutes at Large* is publicly available at https://archive.org/details/statutesatlargeb01virg/page/n6/mode/1up (last visited on Apr. 18, 2024).

statute but maintained a prohibition on the sale or barter of firearms and ammunition to Native Americans. *See* Act XXIII of March 2, 1642, in 1 *Henning's Statutes at Large* at 255. This act, moreover, sanctioned the disarmament of Native Americans: "[W]hat person or persons soever within the colony, shall lend any Indian either piece, powder and shot, it shall be lawful for any person meeting with any such Indian so furnished, to take away either piece, powder or shot…." *Id.* at 255-56. This type of dual prohibition is representative of the two general methods the 17th century colonies employed to prevent firearm possession by Native Americans: disarmament and what is essentially a sales embargo.

For example, the colony of Rhode Island passed a disarmament statute in 1676, ostensibly motivated by the inhabitants' "inconvenience" and "discontent" at the presence of armed Native Americans in the colony "showing no ticket or order so to do." It ordered and authorized:

> …any inhabitant of this Island that shall meet any [Native American or Native Americans] with either gun or guns, or ammunition to take them from him or them, and bring both guns, ammunition, and [Native Americans] before the governor or Deputy Governor, to be examined of the reason of their so doing, and to dispose of them according to either their discretions.

Order of January 22, 1676-7, in 2 *Records Of The Colony Of Rhode Island And Providence Plantations, In New England* at 560-61.[32]

---

[32] A digitized copy of volume 2 of the *Records Of The Colony Of Rhode Island And Providence Plantations, In New England* is available at https://archive.org/details/recordsofcolonyo02rhod/page/n4/mode/1up (last visited on Apr. 18, 2024).

The Dutch colony of New Netherland, which would later become the English colonies of New York and New Jersey, enacted an ordinance in 1656 aimed at preserving public safety that disarmed native Americans:

> [I]n order to prevent such dangers of isolated murders and assassinations, the Director General and Council, with the advice of the Burgomasters of this city, cannot for the present devise any better or other expedient than already stated, and besides that, to interdict and forbid the admission of any [Native American] with a gun or other weapon, either in this city or in the Flatland, into the Villages and Hamlets, or into any Houses or any places, on pain of forfeiting such arms, which may and also shall be taken from them….

Ordinance of July 1, 1656, in *Laws and Ordinances of New Netherland, 1638-1674* at 234-35 (E.B. O'Callaghan ed., 1868).[33]

Aside from the prior examples of direct disarmament statutes, laws targeting the sale of firearms to Native Americans were also common in the colonies. *See*, *e.g.*, Act X of Aug. 21, 1633, in 1 *Henning's Statutes at Large* 219 (prohibiting the sale or barter of guns, powder, shot[], or any arm[]s or ammunition unto any Indian or Indians within this territor[y]" upon penalty of forfeiture and life imprisonment); Act XVII of Jan. 6, 1639, in 1 *Henning's Statutes at Large* 227 (making it a felony to trade with Native Americans for arms and ammunition); *The Charters and General Laws of the Colony and Province of Massachusetts Bay* at 133, ch. 58 (1814) (citing an act passed in 1663, ch. 37, § 2);[34] Act of May 9, 1723, in *Acts and Laws of His Majesties Colony of*

---

[33] A digitized copy of *Laws and Ordinances of New Netherland, 1638-1674* (1868) is available at https://archive.org/details/cu31924080779402/page/n5/mode/2up (last visited on Apr. 18, 2024).

[34] A digitized copy of *Laws of the Colony and Province of Massachusetts Bay* (1814) is available at https://archive.org/details/chartersgenerall00mass/page/n1/mode/2up (last visited on Apr. 18, 2024).

*Connecticut in New England* (Albert C. Bates, eds. 1919) at 292 (preventing persons within the colony from prosecuting "any action of debt, detinue, or other action whatsoever, for any gun or guns, or ammunition lent, sold, or any ways trusted" to Native American and ordering the forfeiture of such firearms);[35] 5 *Records of the Colony of New Plymouth* at 173 (Nathaniel B. Shurtleff, M.D. ed. 1856) (punishing the sale of firearms or ammunition to Native Americans by penalty of death because "it is found, that selling etc., of arms and ammunition to the Indians is very poisonous and destructive to the English");[36] Ordinance of March 31, 1639, in *Laws and Ordinances of New Netherland, 1638-1674* at 18-19 (outlawing the sale of "guns, powder or lead" to Native Americans to prevent "mischief" and "greater evil" upon pain of death); Ordinance of February 23, 1645, in *Laws and Ordinances of New Netherland, 1638-1674* at 47 (prohibiting any trade in "munitions of war" with Native Americans upon pain of death due, in part, to the "serious injury upon this Country, the strengthening of the Indians and the destruction of the Christians" that this practice caused); Act of October 22, 1763, 6 Stat. at Large of Pa. 319, ch. 506, § 1 (prohibiting the giving, sale, barter or exchange of guns, gunpowder, shot, bullets, lead or other warlike stores without license" and punishing violations with fines, lashings and twelve-month's imprisonment).[37]

---

[35] A digitized copy of *Acts and Laws of His Majesties Colony of Connecticut in New England* (1919) is available at https://archive.org/details/actslawsofhismaj00conn/page/n3/mode/2up (last visited on Apr. 18, 2024).

[36] A digitized copy of volume 5 of *Records of the Colony of New Plymouth* (1856) is available at https://archive.org/details/recordsofcolonyo05newp/mode/2up (last visited on Apr. 18, 2024).

[37] After ratification, some state and territorial governments continued to enact bans on the sale of firearms and ammunition to Native Americans as well as disarmament statutes. *See, e.g.*, 1798 Ky. Acts 106, § 5 (prohibiting

Although there is a clear difference between statutes outlawing the sale of firearms to Native Americans and those directly disarming them, both types of colonial statutes seem to have been aimed at preventing Native Americans from possessing them. Some scholars have suggested that the distinction between both types of prohibition only serves to underscore Native Americans were considered to be, as a group, both "dangerous" and "outsiders." *See* Blocher & Carberry, *supra* at 6-7, n. 51. The Court notes that this characterization is consonant with the continued exclusion of Native Americans from the body politic in the 19th century, ostensibly due to their latent allegiance to their tribes. *See Elk v. Wilkins*, 112 U.S. 94 (1884) (denying birthright citizenship to Native Americans because at the time the Constitution was "originally established… the members of the… tribes owed immediate allegiance to their several tribes…" and likening them to unnaturalized foreigners).

Therefore, when taken together, these statutes evince a practice among the colonies of disarming a particular group they considered to be outside their political community. Those statutes prohibiting the sale of firearms to Native Americans also suggest as much, given their purported justifications based on the safety of the community. Insofar as the governments of the colonies saw themselves as having the power to take acts in furtherance of impeding the possession of firearms by Native Americans, be it by disarmament or a general sales prohibition, the Court considers these statutes as probative as to the scope of the Second Amendment.

---

"negro[es], mulatto[es], or Indians whatsoever" from carrying arms upon penalty of forfeiture and lashing); 1844 Mo. Laws 577, ch. 80, § 4; 1853 Or. Rev. Stat., 257, § 1; *see also* An Act to prevent Indians from roaming at large through the Territory, 1827, in Leslie A. Thompson, *A Manual or Digest of the Statute Law of the State of Florida* (1874).

### d.  Other types of disarmament statutes.

Through its own efforts, the Court has found historical statutes that could offer additional support for the proposition that persons outside what was considered the political community in the Founding Era could and were subject to being disarmed. These statutes include those aimed at disarming enslaved persons and Black persons[38] as well as anti-hunting laws.[39]

---

[38] *See, e.g.*, Acts of January 6th, 1639, Act X, in 1 *Henning's Statutes at Large* at 226 (Virginia colonial statute providing arms and ammunition to "all persons except negroes"); Acts of October 2, 1694, ch. 2 in *The Grants, Concessions, and Original Constitutions of the Province of New Jersey* at 340 (1881) (East New Jersey colonial law prohibiting slaves from carrying "any gun or pistol" to curb hunting); Act of October 29, 1730, ch. 586 in 2 *Laws of the Colony of New York from the year 1664 to the Revolution* at 687 (1894) (forbidding the possession and use of "any gun, pistol" and other weapons by enslaved persons, unless as allowed by their slaveowner); Act No. 187 of December 24, 1768 in *Digest of the Laws of the State of Georgia* at 153 (Robert & George Watkins, eds., 1800) (prohibiting enslaved persons from carrying or using firearms unless accompanied by a white person or carrying written permission from their slaveowner, as well as establishing the right of slave patrols to examine "any negro house" in search of weapons and ammunitions); Act of December 17, 1792, ch. 103, § 8 in *A Collection of All Such Acts of the General Assembly of Virginia, of a Public and Permanent Nature, as are Now in Force* at 187 (1803) (post-ratification state law prohibiting any "negro or mulatto," including free persons, from keeping or carrying firearms and ammunition); 1797 Del. Laws ch. XLIII, §6 in 1 *First Laws of the State of Delaware* at 104 (1797) (post-ratification state law prohibiting any enslaved person from carrying arms without slaveowner's permission).

[39] *See, e.g.*, *Heller*, 554 U.S. at 593 (citing the 1671 English Game Act); Acts of October 2, 1694, ch. 2 in *The Grants, Concessions, and Original Constitutions of the Province of New Jersey* at 340 (justifying disarmament of slaves under the pretense that "the inhabitants of this Province… are greatly injured by slaves having liberty to carry guns and dogs into the woods and plantations, under the pretense of gunning, do kill swine."); Act of December 21, 1771, 1771 N.J. Sess. Laws ch. 540, § 3 (seeking to preserve deer and other game by, among other things, disarming "non-residents of th[e] colony" who hunted in another's property without permission); 1902 N.J. Laws 780, ch. 263, § 1 ("Every non-resident of this state shall be required to take out a license before he shall begin hunting or gunning in this state….."); 1903 Pa. Laws 178, § 2 (outlawing "[p]ossession of a gun, in the fields or in the forests or on the waters of this Commonwealth, by an unnaturalized, foreign-born resident or a non-resident of this Commonwealth" without a license); 1905 Utah Laws 197, ch. 118, § 30 ("It shall be unlawful for any non-resident person or for resident who is not a citizen of the United States to kill any game, animals, birds or fish in this State" without a license); 1909 Pa. Laws 4666, § 1 (modifying prior hunting prohibition applicable to nonresidents and noncitizens to incorporate self-defense or the defense of property as an exception to liability, to include possession of shotguns "or rifle of any make, and to provide for forfeiture of these.); 1915 N.J. Laws 662-63, ch. 355, § 1 (same); 1915 N.D. Laws 225, ch. 161, § 67 (same); 1917 Minn. Laws 839-40 ch. 500, § 1 (same); 1917 Utah Laws 278, ch. 95, § 1 (same); 1919 Colo. Sess. Laws 416–417, § 1 (same); 1921 N.M. Laws 201-02, ch. 113, §§ 1, 2 (same); 1921 Mich. Pub. Acts 21 (same); 1923 N.Y. Laws 140–141, ch. 110, § 2 (same); 1923 Conn. Acts 3732, (same). While 20th century practice is not instructive as to the meaning of the Second Amendment "when it contradicts earlier evidence," *Bruen*, 597 U.S. at 66, in this case it does demonstrate a bridge between an English and colonial practice and more modern firearm disarmament statutes, and there is no "earlier evidence" to contradict.

However, because the government did not rely on these types of statutes for its argument, the Court will not afford them decisional weight, consistent with "our adversarial system of adjudication [where courts] follow the principle of party representation." *Bruen*, 597 U.S. at 25 n. 6 (citing *United States v. Sineneng-Smith*, 590 U.S. 371, 375 (2020)).

***

At this juncture, it is important for the Court to pause and explain its reliance and focus on the above-cited antiquated laws. While the justification behind these statutes is the object of the Court's inquiry, the underlying values and principles many of them reflect are undoubtedly repugnant to modern standards of civilization, not to mention to the Constitution's due process and equal protection guarantees. State restrictions on fundamental rights based on race and religion, such as those these laws may reasonable be seen as representing, would surely be unconstitutional today. However, the Court must objectively consider the *why* behind them in order to ascertain the scope and limitations of the right enshrined in the Second Amendment. This will sometimes entail examining in some detail the darkest chapters of the nation's history. *Bruen* all but forces this methodology. *See generally* Jacob D. Charles, *On Sordid Sources in Second Amendment Litigation*, 76 Stan. L. Rev. Online 30 (2023), available at https://www.stanfordlawreview.org/online/on-sordid-sources-in-second-amendment-litigation/ [https://perma.cc/2NGB-4YDT] (last visited Apr. 18, 2024). The Court stresses, **emphatically**, that its use of these sordid laws is limited to their utility as historical guideposts. In the end, the fact is that the Court must discharge its duty under *Bruen*, and it has labored here to weave

together its reasoning in a manner respectful to our modern understanding of the Constitution and human rights.

4.      **Coming full circle: A tradition of disarming dangerous persons for their perceived lack of allegiance.**

The practice of the colonies and early states, evidenced by the reviewed statutes, shows that the possession of firearms by a particular group of "dangerous" persons could be regulated to the point of disarmament. Beginning with 17th and 18th century English history, Parliament disarmed Catholics for the political stability and safety of the country. Some colonies in the 18th century followed that example in the context of protecting themselves during the Seven Years' War with Catholic France. Also, the perennial conflicts between the English colonists and the Native American inhabitants of the continent prompted several colonial laws aimed at keeping firearms out of the latter's hands. This included statutes that authorized their complete disarmament as well as a prohibition on the sale of firearms to them. Similar statutes aimed at keeping firearms out of the hands of Native Americans (and others) were adopted by some states and territories even after ratification of the Second Amendment. And during and after the Revolutionary War, many early states, at the urging of the Continental Congress, enacted loyalty oath requirements meant to fully disarm persons who did not share in the cause of independence, deeming their possession of firearms to be dangerous to the nascent states.

These Founding Era statutes are reflective of a concern among the Framers and their immediate predecessors that allowing firearms in the hands of specific classes of persons was

dangerous to the integrity of the political community. Both Catholics in the colonial era as well as Native Americans up to and through ratification were considered "dangerous" on the basis that the posed a threat to the state. This same idea motivated the allegiance statutes enacted during the Revolutionary War and in the decade after, aimed at those who could not be trusted to support the nascent state governments. In all, within the larger subset of dangerous persons, they represented a particular danger because of on their perceived lack of loyalty to the government. The Second Amendment, as understood by the Framers in 1791, thus likely allowed the regulation of the possession of firearms by these types of persons, as they were outside of what was considered the political community at the time despite their physical presence in the national territory.

And here is where Section 922(g)(5) is analogous. As seen above, the principal motivator behind the prohibition contained in this statute was Congress' desire to prohibit dangerous or untrustworthy persons from possessing firearms. It was enacted in the wake of several high-profile assassinations in the 1960s that upended the social and political stability of the country. The statements of Senator Long and several Representatives, as well as the Congressional findings included section 1201 of the Omnibus Act, evince that Congress was concerned in part with preventing upheavals of the kind caused by these threats, such as political assassinations and the ensuing instability. That justification is analogous enough to that which motivated the disarmament of Catholics, Native Americans, and the potentially disloyal in the Founding Era.

This is not a novel conclusion, as it was shared by then-Judge Barrett in her influential dissent in *Kanter v. Barr*, 919 F.3d 437, 451 (7th Cir. 2019), a pre-*Bruen* case involving the felon-in-possession prohibition of Section 922(g)(1). There, as here, Judge Barrett analyzed several historical statutes disarming Catholics, Native Americans, the potentially disloyal, and enslaved persons as well, concluding that those statutes evinced a "practice of keeping guns out of the hands of 'distrusted' groups." 919 F.3d at 458. Her conclusion was that "the historical evidence does… support [the] proposition [] that the legislature may disarm those who have demonstrated a proclivity for violence or whose possession of guns would otherwise threaten public safety." *Id.*, at 454. And, to a similar extent, this same legislative power was confirmed by the Fifth Circuit panel that decided *Daniels*. *See Daniels*, 77 F.4th at 350-53 (finding that examples of statutes disarming loyalty oath refusers and religious minorities together "suggest a public understanding that when a class of individuals was thought to pose a grave danger to public peace, it could be disarmed.").[40]

In sum, and as relevant to the analogical inquiry, the security of the community and the state was justification enough for Congress to disarm certain categories of persons it deemed too dangerous or untrustworthy to be allowed to possess firearms. Among these categories,

---

[40] One cannot be faulted for wondering what limit, if any, would apply to Congress' ability to designate groups or classes of people as "dangerous" and subject to disarmament. In *Kanter*, then-Judge Barrett relied on the reasonable but now forbidden means-end test for that limitation. *See Kanter* at 919 F.3d at 465 (Barrett, J., dissenting). After *Bruen*, it would seem that rigorous analogical reasoning is the Supreme Court's endorsed method for keeping Congress in check. How that fares in practice is a hypothetical this Court need not indulge today to resolve the matter before it.

Congress has elected to include noncitizens unlawfully present in the United States, a class of persons over which the political branches of government hold considerable regulatory power. *See Arizona v. United States*, 567 U.S. 387, 394 (2012) ("The Government of the United States has broad, undoubted power over the subject of immigration and the status of aliens."); *Matthews v. Diaz*, 426 U.S. 67 (1976) ("For reasons long recognized as valid, the responsibility for regulating the relationship between the United States and our alien visitors has been committed to the political branches of the Federal Government.").

For these reasons, and after the above review of Founding Era authorities, the Court finds that Section 922(g)(5)(A) is consistent with the United States' historical tradition of firearms regulation. Consequently, defendant's facial challenge to its constitutionality under the Second Amendment fails to pass muster. Defendant's first objection to the Magistrate Judge's R&R is hereby **OVERRULLED**.

### C. Defendant's as-applied challenge to Section 922(g)(5) fails.

Having failed in his facial challenge to Section 922(g)(5)(A), defendant's as applied challenge fares no better. Defendant argues that the Magistrate Judge's conclusion is erroneous because "there are no 'well-established and representative historical analogues;' and allegiance-related laws were not widespread and were mostly related to conscientious objectors not noncitizens…." **ECF No. 40** at 6.  This perfunctory objection, the Court notes, is not waived only because it essentially incorporates by reference his prior objection to the facial challenge. But by doing so, it meets the same fate.

Defendant's second objection relating to his as-applied constitutional challenge to Section 922(g)(5) is therefore **OVERRULED**.

### D. Section 922(g)(5) does not violate the Equal Protection Clause of the Fourteenth Amendment.

Finally, defendant objects to the Magistrate Judge's recommendation to deny his challenges under the Civil Rights Act, 42 U.S.C. § 2000a, *et seq.*, and the equal protection clause of the Fourteenth Amendment, U.S. Const. amend. XIV. The Magistrate Judge correctly concluded that the statutory challenge was underdeveloped and waived. **ECF No. 32** at 13-14. The Magistrate Judge then considered defendant's equal protection challenge on its merits, analyzing whether Section 922(g)(5) impermissibly discriminates on the basis of alienage. *Id.* Applying rational basis scrutiny under the Fifth Amendment's due process clause—not the Fourteenth's equal protection clause—the Court found that Section 922(g)(5) does not impermissibly discriminate against defendant. *Id.*, at 14.[41]

Defendant objects on the basis that the Fourteenth Amendment's equal protection guarantee should apply to him and "all people." **ECF No. 40** at 7. But that is not in dispute here. The equal protection clause of the Fourteenth Amendment protects persons against

---

[41] The Magistrate Judge also clarified that the government's reliance on these discriminatory laws was limited to complying with *Bruen's* historical inquiry. *See* **ECF No.** 32 at 10; *see also United States v. Rowson*, No. 22 CR. 310 (PAE), 2023 WL 431037, at *22 (S.D.N.Y. Jan. 26, 2023) ("It goes without saying that, in our modern era, a law that would disarm a group based on race, nationality, or political point of view—or on the assumption that these characteristics bespoke heightened dangerousness—would be anathema, and clearly unconstitutional. *See Drummond v. Robinson Twp.*, 9 F.4th 217, 228 n.8 (3d Cir. 2021) (discussing such laws). But the Second Amendment's inquiry into historical analogues is not a normative one."). As noted above and elsewhere in this Opinion & Order, the Court is of the same mind.

discriminatory legislation made or enforced by "States," not the federal government. U.S. Const. amend. XIV ("…nor shall any State… deny to any person within its jurisdiction the equal protection of the laws."). Section 922(g)(5) is a federal law enacted by Congress. Therefore, the Fourteenth Amendment's equal protection clause is facially inapplicable to defendant's claim.[42]

Notwithstanding, the Magistrate Judge proceeded to construe the claim as one arising under the Fifth Amendment's due process clause, which is opposable to the federal government and reads: "No person shall… be deprived of life, liberty, or property, without due process of law…." U.S. Const., amend. V. *See* **ECF No. 32** at 14. Challenges to Section 922(g)(5) under this rubric have failed for some time under rational-basis scrutiny. *See, e.g., United States v. Carpio-León*, 701 F.3d 974, 982 (4th Cir. 2012); *United States v. Huitrón-Guizar*, 678 F.3d 1164, 1167-1170 (10th Cir. 2012). Most recently, the Tenth Circuit denied an equal protection challenge to Section 922(g)(5)(A) applying rational basis scrutiny:

> As other circuits have recognized, there is a rational relationship between prohibiting unlawfully present aliens from possessing firearms and achieving the legitimate goal of public safety. *See Huitron-Guizar*, 678 F.3d at 1170. In enacting § 922(g)(5)(A), Congress may well have concluded that unlawfully present aliens "ought not to be armed when authorities seek them"—particularly where, as here, the alien enters the United States to evade prosecution for murder in another country. *See id.* Moreover, those in the United States without authorization may be more likely to acquire firearms through illegitimate and difficult-to-trace channels, making § 922(g)(5)(A)'s prohibition all the more reasonable. *See Carpio-*

---

[42] As noted above, there is an open question as to what relevance the historical record surrounding the adoption of the Fourteenth Amendment in 1868 may have on the constitutionality of firearm regulations. *See supra,* at n. 11. Suffices to say that it is not hard to see some tension between the federal government's plenary power to regulate immigration, subject only to rational scrutiny review, and the right to keep and bear arms guaranteed by the Second Amendment, a right deemed in *McDonald* as being among those fundamental rights "necessary to our system of ordered liberty." *See McDonald*, 561 U.S. at 778. This, however, is a question neither raised nor briefed by any party, and so the Court is spared from delving any deeper.

> *Leon*, 701 F.3d at 982-83. Indeed, Congress could have rationally determined that unlawfully present aliens themselves are more likely to attempt to evade detection by assuming a false identity—again, as Sitladeen did. *See id.* Further, we find it significant that the Supreme Court has "firmly and repeatedly endorsed the proposition that Congress may make rules as to aliens that would be unacceptable if applied to citizens." *Demore v. Kim*, 538 U.S. 510, 522, 123 S. Ct. 1708, 155 L.Ed.2d 724 (2003).

*United States v. Sitladeen*, 64 F.4th 978, 989 (8th Cir. 2023). The Court wholly concurs with the Tenth Circuit's reasoning and sees no need to go further.[43]

The Court has already determined that the Second Amendment is not an impediment to legislation regulating the possession of firearms by noncitizens unlawfully present in the United States. Neither is the Fifth Amendment's due process clause under rational basis scrutiny. Therefore, the Court **OVERRULES** defendant's third and final objection.

### E.    A *coda* on the *Bruen* test.

The Supreme Court's *Bruen* test is a novel standard and, as such, its application can be reasonably expected to vary across the hundreds of federal and state courts in the United States.[44] Its singular "hyperfocus" on the history firearms regulations requires extensive research on behalf of parties and judges. Coupled with its heavy reliance on analogical

---

[43] Again, one cannot be faulted for thinking that there is some inherent tension between applying means-end scrutiny to a firearm regulation under one part of the Constitution when the Supreme Court so forcefully repudiated such tests under another. But this tension is somewhat eased by seeing the *Bruen* test as a constitutional minimum for this type of regulation. Any federal law that discriminates on the basis of alienage, whether it pertains to firearms or not, must still meet the standards applicable to other constitutional protections.

[44] For a preliminary survey of the hundreds of cases that have already applied *Bruen*, see Jacob D. Charles, *The Dead Hand of a Silent Past: Bruen, Gun Rights, and the Shackles of History*, 73 Duke L.J. 67 (2023).

reasoning, the *Bruen* test necessarily invites profound differences of opinion as to whether certain historical precedents are sufficiently analogous to modern-day firearms regulations.

Case in point: in a relatively recent decision from the Western District of Texas, a federal declared Section 922(g)(5)(A) unconstitutional under *Bruen*. *See United States v. Sing-Ledezma*, No. EP-23-CR-823(1)-KC, 2023 WL 8587869 (W.D. Tex. Dec. 11, 2023). According to the *Sing-Ledezma* court, the "general societal problem" of "unknown foreigners stepping onto American soil, potentially with firearms, and certainly with unknown intentions, is not a new one…." *Id.*, at *12. The *Sing-Ledezma* court derives this historical conclusion from the lack of immigration regulation in the Founding Era and throughout most of the 19th century, reasoning that such an absence of regulations must mean that an *armed* subset of immigrants must have been tolerated. *Id., at* *10-12. Examining many of the same historical statutes as this Court has here, the *Sing-Ledezma* court concluded that these were not analogous enough to uphold Section 922(g)(5)(A) because, historically, armed immigrants were not disarmed, and thus found the statute unconstitutional on its face. *Id.*, at *18.

Setting aside the merits of the *Sing-Ledezma* court's conclusions—with which this Court disagrees—the situation illustrates the all-too-real concern that judges looking at the same history (or lack thereof) are now forced to make consequential pronouncements on historical "truths" and derive their legal conclusions from them. As illustrated by the contrast between the *Sing-Ledezma* court's reasoning and this Court's own, the chasm between these "truths" can be vast. Differing conclusions may be a judicially acceptable outcome for evidentiary disputes

or statutory interpretations, but it certainly feels different—and more perilous—when conclusions about the Nation's history are at play. After all, there is no "Supreme Court of History" in our country to convincingly review the historicity of the lower courts' analysis.

Seemingly anticipating this result, the Supreme Court explained in *Bruen*:

[W]e acknowledge that applying constitutional principles to novel modern conditions can be difficult and leave close questions at the margins. But that is hardly unique to the Second Amendment. It is an essential component of judicial decisionmaking under our enduring Constitution. We see no reason why judges frequently tasked with answering these kinds of historical, analogical questions cannot do the same for Second Amendment claims.

597 U.S. at 31 (citation and quotation marks omitted). Here, the Court has attempted to heed the Supreme Court's instruction, but the difficulties inherent in this task are too notable to be considered solely the province of "the margins." *Bruen* all but invites judges to derive legally significant conclusions from an incomplete understanding of historical facts.

Throughout this Opinion & Order, evidenced not only in the text but in the footnotes, the Court has made pointed observations on certain aspects of the *Bruen* test. This is because the test, as it stands today, needs refining (at the very least) and the lower courts need clearer guidance on its application. District courts are not normally well equipped to take on the sensitive task of poring over historical records and deriving historical truths from it, whether compiled by the parties or not. The Court here has expended considerable time and effort in doing so, resources that have necessarily shifted its focus from other matters in its docket.[45]

---

[45] Some courts have decided that outside assistance may be needed for the historical inquiry in the form of court-appointed expert historians or *amici curiae*. *See United States v. Daniels*, 77 F.4th at 360 n. 14 (Higginson, J., concurring)

Practical considerations aside, *Bruen's* historical test undoubtedly elevates the importance of history in constitutional scrutiny in important and consequential ways. It forces a public reckoning with the Second Amendment's history—one that often includes laws excluding socially marginalized individuals or groups from the full enjoyment of constitutional rights under pretenses that our current understanding of the Constitution may find repugnant. Requiring litigants and the courts to go spelunking through history in the search for comparable counterparts or analogues will result in uncomfortable confrontations with laws that reflect our forebearers' least commendable values.[46] *Bruen* asks that courts nonetheless fit modern-day laws into Founding Era conceptions of (as in this case) race, religion, and allegiance—concepts whose understandings vary significantly today from that of the 18th and 19th centuries. One cannot be faulted for wondering whether this historical-analogical inquiry is more suited for an academic's ivory tower than for a trial judge's chamber.

---

(noting helpfulness of having made an open call for *amici* briefs); *United States v. Bullock*, No. 3:18-CR-165-CWR-FKB, 2023 WL 4232309, at *4-5 (S.D. Miss. June 28, 2023) (discussing desirability of appointment of experts). The Court expresses no opinion on the desirability of such assistance.

[46] In this vein, the Court notes that there are uncomfortable similarities between the analysis it is required to perform under *Bruen* and that reflected in the Supreme Court's notorious opinion in *Dred Scott v. Sandford*:

> We refer to these historical facts for the purpose of showing the fixed opinions concerning that race, upon which the statesmen of that day [i.e., the Framers] spoke and acted. It is necessary to do this, in order to determine whether the general terms used in the Constitution of the United States, as to the rights of man and the rights of the people, was intended to include them [i.e., enslaved persons], or to give to them or their posterity [i.e., their children] the benefit of any of its provisions.

60 U.S. 393 (1857), *superseded by constitutional amendment*, U.S. Const. amend XIV. This is not too different from resting legal conclusions *solely* on what the Framers' views and opinions were as to groups they considered to be political outsiders.

Independent of its outcome, the historical inquiry mandated by *Bruen* provides a valuable opportunity for courts to disabuse the public of any notion that the value judgments ingrained in antiquated laws can ever be validly applied in our society today. In arguing or applying *Bruen's* test, parties and judges certainly take the risk that recourse to such laws may be seen as tacit endorsements. But litigants and courts look to this history only to ascertain the breadth of the government's power to regulate firearms. A regulation that passes muster under *Bruen*'s vision of the Second Amendment may fall under other provisions of the Constitution.

Therefore, while *Bruen* certainly creates a need to dig through history in search of validation, it does not validate what progress has clearly left behind. The analytical tightrope is a thin one, but it is certainly there for judges to walk.

**V.      Conclusion**

For the reasons stated above, the Court hereby **ADOPTS** the R&R's recommendations as modified herein and **DENIES** defendant's motion to dismiss Count Two of the indictment, at **ECF No. 19**.

**SO ORDERED**.

At San Juan, Puerto Rico, on this 18th day of April, 2024.

**S/AIDA M. DELGADO-COLÓN**
**United States District Judge**